Jennifer R. Schemm, OSB #970086
Attorney at Law
602 O Avenue
La Grande, OR 97850
Tel: 541-910-4833
Fax: 541-962-7831
Email: jschemm@eoni.com

Jennifer R. Schwartz, OSB #072978
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
Email: jenniferroseschwartz@gmail.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **HELLS CANYON PRESERVATION COUNCIL**, an Oregon nonprofit corporation, and **OREGON WILD**, an Oregon nonprofit corporation, | Case Number: |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **KRIS STEIN,** in her official capacity as District Ranger of the Eagle Cap Ranger District, Wallowa-Whitman National Forest, and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture, | (National Environmental Policy Act, National Forest Management Act, Healthy Forests Restoration Act, and Administrative Procedure Act) |
| Defendants. | |

**INTRODUCTION**

1.  Plaintiffs Hells Canyon Preservation Council ("HCPC") and Oregon Wild ("OW") challenge Defendant United States Forest Service's Decision Memo approving the Lostine Public Safety Project ("Lostine Project" or "Project") via a Categorical Exclusion ("CE").  This agency action violates the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), those statutes' implementing regulations, and the Healthy Forests Restoration Act ("HFRA").

2. The Lostine Project is located on the Eagle Cap Ranger District of the Wallowa-Whitman National Forest ("WWNF").  While labeled a "public safety" project and promoted as such in several press releases, only seven percent of the Project's tree removal, at most, is designed to protect people.  The Project's Decision Memo provides that the remaining trees are being commercially logged to "reduce the current and future risk of insect and disease impacts." Insects and disease are natural disturbance processes that have influenced these forests for millennia.

3. The Project authorizes extensive logging and "hazard tree" removal on over 2,100 acres of forest within the Wild and Scenic Lostine River corridor, a beloved place for both residents and visitors to the Eagle Cap Wilderness.  Designated a Wild and Scenic River by Congress in 1988 for its outstandingly remarkable values ("ORVs"), the Lostine River corridor, in addition to its exceptional scenic and recreational opportunities, provides unique habitat for a myriad of sensitive plant, wildlife, and aquatic species as well as critical habitat for threatened fish.

4.  All told, the Lostine River corridor is home to fourteen Forest Service Region 6 Sensitive plant species, including the greatest variety of moonworts or grapeferns found anywhere in the United States, and numerous other remarkable botanical species.

2 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

5. The Lostine River is also federally designated critical habitat for spring and fall Snake River Chinook salmon, steelhead, and bull trout, all listed as Threatened species under the Endangered Species Act.

6. Unlike Eastern Oregon's drier, lower elevation Ponderosa Pine forests, the Project area here is classified as either moist or cold upland forest with nearly one-third of the forest at or nearing old growth status.

7. This moist and cold upland forest provides suitable habitat for Pacific Fisher and wolverine, both Forest Service Region 6 Sensitive species, and source habitat for American marten, a designated Management Indicator Species ("MIS") associated with mature and old forest ecosystems.

8. The Lostine Project, projected to remove at least four million board feet of trees from this cherished river corridor, represents a significant change in the agency's decades-long practice of only lightly managing this forest to avoid impacts to the corridor's outstanding values. The way the agency has now chosen to change course and aggressively manage this area violates several laws.

9. The Forest Service violated NEPA by improperly authorizing the Project through the use of a CE when the circumstances require, at a minimum, review in an Environmental Assessment ("EA"). Numerous special resource conditions exist within the Project area that will be adversely affected by the approved logging and related activities, including the congressionally designated Lostine Wild and Scenic River corridor, potential wilderness, federally listed threatened fish and their critical habitat, and several Forest Service sensitive plant, wildlife, and aquatic species. Any uncertainty as to the Project's impacts on these special resources gives rise to "extraordinary circumstances" that preclude the use of a CE.

10. The Forest Service violated NFMA by authorizing a project that is inconsistent with the Wallowa-Whitman Land and Resource Management Plan ("Forest Plan") as amended by the Lostine River Wild and Scenic River Management Plan ("Lostine River Plan"). Pursuant to the Forest Plan, the agency must manage habitat to ensure species viability will be maintained. Under the River Plan, all logging must be done in a manner that best protects and enhances the corridor's outstandingly remarkable values. Contrary to these mandates, the Forest Service has failed to ensure that species viability will be maintained with the extensive logging and associated activities authorized in the Decision Memo, and failed to demonstrate that the approved activities will best protect and enhance the river corridor's remarkable plants, wildlife, and fisheries.

11. And last, the Forest Service violated HFRA, as amended by the 2014 Farm Bill, because it failed to develop this Project through a transparent, nonexclusive collaborative process involving multiple interested persons representing diverse interests. The conservation community, which is represented by HCPC and OW, was not included in any collaborative process. The development of the Project was also far from transparent, with the Forest Service refusing to provide information to Plaintiffs regarding the impacts of the Project on the area's resources, including the outstandingly remarkable plants and wildlife. Then, after the Project's development was essentially complete, and some documents posted on the agency's website, the agency delayed providing Plaintiffs with documents not posted online, and for some documents, required Plaintiffs to use the Freedom of Information Act process.

12. To prevent the Forest Service from violating its legal duties under these laws, thereby jeopardizing the area's outstandingly remarkable values, violating the Forest and River Plans, and disregarding the basic tenets of collaboration, Plaintiffs request that the Court vacate and set

aside the Forest Service's Lostine Project Decision Memo and order appropriate declaratory and injunctive relief to remedy these violations.

## PARTIES

13. Plaintiff **HELLS CANYON PRESERVATION COUNCIL** ("HCPC") is a regional nonprofit organization based in La Grande, Oregon with approximately 1,000 members. HCPC's mission is to connect, protect, and restore the wild lands, waters, native species and habitats of the greater Hells Canyon region, ensuring a legacy of healthy ecosystems for future generations. HCPC has been actively involved in regional and local logging issues. A focus of HCPC's work is to prevent and restore resource degradation resulting from logging on federal public lands. HCPC's staff and members regularly visit the Lostine Project area and surrounding federal lands. HCPC's staff and members seek to ensure that the Forest Service faithfully and fully implements and complies with federal law in managing the natural resources of the Lostine Project area as a means of protecting their interests.

14. HCPC's staff and members hike, hunt, camp, birdwatch, photograph scenery and wildlife, use, and engage in other vocational, scientific, and recreational activities within the Lostine Project area. HCPC's staff and members derive recreational, inspirational, scientific, and aesthetic benefit from their activities within the Lostine Project area. HCPC's staff and members intend to continue to use and enjoy the Lostine Project area and surrounding forested lands, waters, and canyons frequently and on an ongoing basis in the future.

15. The aesthetic, recreational, scientific, and spiritual interests of HCPC's staff and members have been and/or will be adversely affected and irreparably injured by the Forest Service's actions. Their injuries are predicated on unlawful Forest Service actions which have: significantly diminished the trust between the conservation community and the Ranger District;

facilitated the risk of unsupported and uninformed management and decision-making; compromised the Forest Service's ability to prohibit and mitigate harm to the public lands and wildlife of the Lostine Project area from commercial logging; increased the risk of actual, threatened, and imminent environmental harm; and created actual, concrete injuries to HCPC and its interests. Because HCPC seeks to ensure informed decision-making, compliance with federal law, and the prevention of unacceptable harm to the Project area and the native species that occupy it from logging, HCPC's injuries would be redressed by the relief sought.

16. HCPC participates extensively in administrative actions to protect its interests within the Wallowa-Whitman National Forest.  HCPC participated, to the extent allowed by the Ranger District, in the administrative process for the Lostine Project, including submitting scoping comments and attending a field trip.  HCPC has exhausted all available administrative remedies (though there are no administrative appeal or objection opportunities for projects that are categorically excluded from documentation in an EA or EIS).  Reviewable final agency action exists that is subject to this Court's review under 5 U.S.C. §§ 702 & 704.

17. Plaintiff **OREGON WILD** is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest.  Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy.  Oregon Wild members use the forest areas comprising the Lostine Project area for hiking, recreation, wildlife watching, nature appreciation, and other recreational pursuits.  Oregon Wild's members will be impaired if the Lostine Project area is logged as described in the Decision Memo. The interests of Oregon Wild and its members will be irreparably harmed if the Lostine Project is allowed to proceed without compliance with federal environmental laws.

18. OW's staff and members regularly visit the Lostine Project area and surrounding federal lands. OW's staff and members seek to ensure that the Forest Service faithfully and fully implements and complies with federal law in managing the natural resources of the Lostine Project area as a means of protecting their interests.

19. OW's staff and members hike, hunt, camp, photograph scenery and wildlife, use, and engage in other vocational, scientific, and recreational activities within the Lostine Project area. OW's staff and members derive recreational, inspirational, scientific, and aesthetic benefit from their activities within the Lostine Project area. OW's staff and members intend to continue to use and enjoy the Lostine Project area and surrounding forested lands, waters, and canyons frequently and on an ongoing basis in the future.

20. The aesthetic, recreational, scientific, and spiritual interests of OW's staff and members have been and/or will be adversely affected and irreparably injured by the Forest Service's actions. Their injuries are predicated on unlawful Forest Service actions which have: diminished the trust between the conservation community and the Ranger District; facilitated the risk of unsupported and uninformed management and decision-making; compromised the Forest Service's ability to prohibit and mitigate harm to the public lands and wildlife of the Lostine Project area from commercial logging; increased the risk of actual, threatened, and imminent environmental harm; and created actual, concrete injuries to OW and its interests. Because OW seeks to ensure informed decision-making, compliance with federal law, and the prevention of unacceptable harm to the Project area and the native species that occupy it from logging, OW's injuries would be redressed by the relief sought.

21. OW participates extensively in administrative actions to protect its interests within the Wallowa-Whitman National Forest.  OW participated, to the extent allowed by the Ranger

District, in the administrative process for the Lostine Project, including submitting scoping comments and attending a field trip.  OW has exhausted all available administrative remedies. Reviewable final agency action exists that is subject to this Court's review under 5 U.S.C. §§ 702 & 704.

22. Defendant **FOREST SERVICE** is an agency of the United States and a division of the Department of Agriculture.  It is charged with managing the public lands and resources of the Wallowa-Whitman National Forest, in accordance and compliance with NEPA, NFMA, their implementing regulations, and the HFRA.

23. Defendant **KRIS STEIN**, Eagle Cap District Ranger, is sued solely in her official capacity as the decisionmaker who signed the Lostine Public Safety Project. Decision Memo on April 5, 2017. This Decision Memo is the challenged final agency action in this case.

24. Defendants Forest Service and Stein are collectively referred to as the "Forest Service."

**JURISDICTION AND VENUE**

25. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA); 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), 2202 (injunctive relief); and § 2412 (costs and fees).  Plaintiffs have challenged a final agency action as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 704.  Plaintiffs have exhausted all administrative remedies and are seeking judicial review of a final administrative action of the Forest Service, which was not subject to an administrative review process.  *See* 36 C.F.R. §§ 218.22 & 218.23 (decisions for actions categorically excluded from documentation in an EA or EIS not subject to administrative appeal or objection process); Agriculture Act of 2014, Subtitle A, § 8006.

26. Venue in this Court is proper under 28 U.S.C §§ 1391 and 1392.

//

# LEGAL FRAMEWORK

## National Environmental Policy Act (42 U.S.C. § 4321-4370(h))

27. The primary purposes of the National Environmental Policy Act ("NEPA"), 42 U.S.C.
§4321-4370(h), are to ensure fully informed decision-making and to provide for public
participation in environmental analysis and decision-making. 40 C.F.R. § 1500.1(b), (c). The
Council on Environmental Quality ("CEQ") promulgates regulations implementing NEPA that
are binding on all federal agencies. 40 C.F.R. §§ 1500-1518.4. "NEPA procedures must insure
environmental information is available to public officials and citizens before decisions are made
and before actions are taken." 40 C.F.R. § 1500.1(b).

28. The Forest Service, pursuant to NEPA and its implementing regulations, must take a hard
look at the direct, indirect and cumulative environmental consequences of a proposed action to
the human environment. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8,
and 1508.14. The regulations ensure that federal agencies consider the environmental impacts of
their actions *before* taking those actions.

29. NEPA further obligates the agency to make available to the public high-quality
information, including accurate scientific analyses, before decisions are made and actions are
taken. 40 C.F.R. § 1500.1(b).

30. NEPA requires "responsible [federal] officials" to prepare an Environmental Impact
Statement ("EIS") for any "major Federal actions significantly affecting the quality of the human
environment." Under NEPA, an agency must prepare an EIS when an action *may* have a
significant environmental effect. 42 U.S.C. § 4332. Alternatively, an agency may choose to
begin by preparing an Environmental Assessment ("EA") to gauge whether an EIS is necessary.
40 C.F.R. §1501.3, 1501.4, 1508.9.

31. If an EA establishes that the proposed action may significantly affect the environment, an EIS must be prepared.  If not, the agency must issue a Finding of No Significant Impact (FONSI) setting forth the reasons why the project's impacts are insignificant.  40 C.F.R. § 1501.4.  A secondary purpose of an EA is to fulfill the "hard look" purposes of NEPA when an EIS is not necessary.

32. A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA "only if there are no extraordinary circumstances related to the proposed action[.]" 36 C.F.R. § 220.6(a); 40 C.F.R. § 1508.4.

33.  Forest Service regulations provide a list of resource conditions "that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS." 36 C.F.R. § 220.6(b). This list includes the following relevant conditions: federally listed threatened or endangered species or designated critical habitat; Forest Service sensitive species; potential wilderness; and congressionally designated areas.  *Id.*

34. "The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE).  It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id*.

35. According to the Forest Service's Handbook, "[i]f the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion."  FSH 1909.15, Ch. 30, § 31.2.

36. Agency actions taken pursuant to NEPA are reviewable by this Court under the Administrative Procedure Act. 5 U.S.C. §§ 702, 704, 706.

## National Forest Management Act (16 U.S.C. §§ 1600-1614)

37. The National Forest Management Act ("NFMA"), 16 U.S.C. §1600-1614, is the primary statute governing the administration of national forests.

38. NFMA establishes a two-step process for forest planning. *Id.* § 1604(a); *see also* 36 C.F.R. § 219.10(a), (b). First, it requires the Forest Service to develop and implement a land and resource management plans ("forest plan") for each unit of the National Forest System. 16 U.S.C. §1604(a). The forest plan guides natural resource management activities forest-wide, setting standards, management goals and objectives, and monitoring and evaluation requirements.

39. Second, once a forest plan is in place, site-specific actions, including timber sales, are developed and implemented. All site-specific actions must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

40. The Wallowa-Whitman Forest Plan was adopted in 1990. In 1993, the Forest Service amended this Plan to include the Lostine River Wild and Scenic River Management Plan. The Lostine River Plan sets forth goals, objectives, standards and guidelines for protecting and enhancing the river's Outstandingly Remarkable Values ("ORVs"). The 1993 River Plan recognized fisheries, plants, wildlife, recreation and scenery as the river's ORVs.

41. The Wallowa-Whitman Forest Plan includes, among others, the following relevant standards and guidelines:

- Fish and wildlife habitat shall be managed to maintain viable populations of all existing species within the planning area;

- Prepare a biological evaluation during the environmental analysis of each project to determine possible effects of the proposed activity on threatened, endangered, and sensitive species;

- Monitor known populations of sensitive species and their habitats in accordance with the Forest Monitoring Plan;

42. The Lostine River Plan includes, among others, the following relevant standards and guidelines:

- Outstandingly remarkable values of the river must be protected and enhanced;

- If conflicts arise between ORVs…they shall be resolved according to the following priorities: 1) Fisheries, 2) Vegetation/Botanic 3) Wildlife, 4) Scenic, and 5) Recreation;

- Utilize methods to improve forest health that do not rely on the use of heavy equipment on site;

- Within the Recreational section of the river, timber will be harvested to protect and enhance [outstandingly remarkable] values, for public safety, and for emergency conditions[.]  *** In any case, harvest shall be accomplished in a manner that best protects and enhances OR values.

- Within fish management zones, all ground disturbing activities will be analyzed and designed to have no adverse impact on fish habitat, including riparian areas. In most cases, no activity will be able to take place that has an adverse impact on fish habitat.

### Healthy Forests Restoration Act (16 U.S.C. §§ 6501-6591)

43. In 2014, Congress amended the Healthy Forests Restoration Act ("HFRA") to include 16 U.S.C. §§ 6591a and 6591b ("2014 Farm Bill" amendments to HFRA).  Congress did so in response to "[t]he outbreak of the pine bark beetle" and the subsequent "creat[ion of] potentially hazardous fuel loads in several western states."  *See* 160 CONG. REC. H1408 (daily ed. Jan. 27, 2014) (conference report).  Congress intended to expedite treatment of infested and at-risk areas because "the current system for managing national forests affected by historic insect infestations has not been responsive to the speed and widespread impact of [bark beetle] infestations."  *See id.*

44. HFRA effectuates Congress' intent by allowing the Secretary of Agriculture to designate landscape scale areas that are: "(1) experiencing declining forest health[;] (2) at risk of experiencing substantially increased tree mortality over the next 15 years due to insect or disease infestation[;] or (3) in an area in which the risk of hazard trees poses an imminent risk to public infrastructure, health, or safety."  16 U.S.C. §6591a (b)-(c) (HFRA §602).

45. Once landscape areas are designated, 16 U.S.C. § 6591b (HFRA §603) (referred to as the 2014 Farm Bill's "insect and disease" treatment program) provides that "Collaborative Restoration Projects" in designated areas "may be . . . considered an action categorically excluded" from the usual NEPA process of preparing an EA or EIS if the project meets several criteria.  HFRA §603(a).  As relevant here, the project must be "developed and implemented through a collaborative process that – (i) includes multiple interested persons representing diverse interests; and (ii)(I) is transparent and nonexclusive[.]"  HFRA §603(b)(1)(C)(i). Furthermore, the project "shall be consistent with the [governing forest plan]."  HFRA §603(e).

46. The Forest Service also must conduct public notice and "scoping" for any project or action proposed under HFRA §603.  HFRA §603(f).  "Scoping" is defined in the regulations implementing NEPA at 40 C.F.R. §1501.7 as the "early and open process for determining the scope of the issues to be addressed and for identifying the significant issues related to a proposed action."  According to the Forest Service Handbook, "[s]coping is the means to identify the presence or absence of any extraordinary circumstances that would warrant further documentation in an EA or EIS."  FSH 1909.15, Ch. 30, § 31.3.

47.   The Lostine Project area is included within the broader landscape level lands designated in Oregon pursuant to HFRA §602.  When Oregon Governor Kitzhaber requested this designation, he emphasized his intention was to "build on and not detract from existing

collaborative efforts, which have been built upon foundational dialogue and trust-building between diverse interests."  April 4, 2014 Letter from John Kitzhaber to Thomas J. Vilsack, United States Secretary of Agriculture.

## Administrative Procedure Act (5 U.S.C. §§ 701-706)

48. The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706(2)(A). The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. §704.

## STATEMENT OF FACTS

49. The Lostine Project Decision Memo authorizes, through the use of a CE, commercial logging of trees up to 21" in diameter totaling 3.5 million board feet of timber from approximately 450 acres (including within mature and old growth forest), hand thinning of trees as large as 12 inches in diameter across the entire 2,110-acre Project area, six "group select units" up to 2 or 3 acres in size (whereby existing lodgepole pine stands will be clear-cut and replanted with western larch), three 2-acre "patch cuts" to create fuel breaks and a helispot, and the removal of up to 3,000 "hazard" and "danger" trees (including old-growth trees) adjacent to roads, within developed sites, and where the agency deems necessary to protect employees.  The Project also calls for constructing approximately one and half miles of temporary roads to carry out these activities with the use of heavy mechanized equipment.

50.   Healthy trees, including large and/or old growth, may become "danger" trees if, in the process of implementing the Lostine Project, they are hit or otherwise compromised by the equipment used during road construction or logging activities.

51. On February 3, 2016, the Forest Service issued a public notice for the Lostine Public Safety Project.  In the notice, the agency stated the primary purpose of the Project was to address public safety issues.  The notice letter invited the interested public to "become involved in the planning process by providing us with your comments on this project and visiting with our staff." The Forest Service did not state the Project would be developed using a collaborative process. The agency gave the public 30 days, later extended for a short period, to comment.  The last "scoping" comment was dated March 18, 2016.  Any comment received after that time was deemed by the Forest Service as "post scoping."

52. Prior to receiving the public notice, the only contact HCPC had with the Forest Service was a phone call from Acting District Ranger Lubera stating that the Project's "scoping" letter was forth coming.  The Forest Service did not indicate whether the Project was being considered for categorical exclusion from analysis in an EA or EIS under the 2014 Farm Bill's "insect and disease" treatment program or any other Forest Service categorical exclusion.  HCPC was not invited to participate in any collaborative process to develop the Project.  Plaintiff OW was not contacted prior to receiving the public notice.  No other persons representing the conservation community were contacted prior to the public notice.

53. The Project's activities are slated to occur across 2,110 acres within an eleven-mile stretch of the Lostine Wild and Scenic River corridor within the Eagle Cap Ranger District of the Wallowa-Whitman National Forest.  This section of the river is designated "recreational."

54. The Lostine Wild and Scenic River is a cherished recreational area for residents and visitors to both the Lostine River and Eagle Cap Wilderness.  The narrow, roaded portion of the corridor, often referred to as the "Lostine Canyon," can be described as a cherry stem cutting deeply into the heart of the Wilderness.  The river road ends at the Two Pan Trailhead, a popular access point for hiking along the designated "wild" section of the Lostine River ending at Minam Lake.

55. The Lostine River corridor supports a diversity of fish, wildlife and plant species. This area is federally designated critical habitat for "threatened" salmon, steelhead and bull trout.  The Project area is also known for its unique habitat that supports numerous Forest Service Region 6 "sensitive" botanical species and contains several other "sensitive" aquatic and terrestrial wildlife species.

56. The vegetation in the Lostine Canyon is considered outstandingly remarkable due to the variety of plant species.  The Canyon is home to fourteen species of *botrychium* or moonwarts, the greatest variety found anywhere in the United States.  Moonwarts, also referred to as grape-ferns, are a small, fern-like species, that do not produce above ground plants in years when there are insufficient early spring rains.  As such, surveys may not detect these plants in dry years when conditions do not favor germination.  Moonwarts are so tiny and difficult to find in dense vegetation that they can be overlooked during surveys and logging related activities. The Project area is also home to many other "outstandingly remarkable" plants, many of which are also Forest Service "sensitive" species.  In all, there is suitable habitat for thirty-two ORV plant species known or suspected to occur within the Project area, fourteen of which are "sensitive" species.

57. The Forest Service did not prepare a Biological Evaluation for the Project's impacts to sensitive plants. Rather, the agency prepared an eight-page *draft* botanical report, concluding that several sensitive and ORV plants and their habitat may be adversely affected by the proposed activities.  This report did not substantiate how the Project is consistent with Forest Plan/River Plan management direction related to sensitive and ORV plants.  The report does not establish logging and related activities will protect and enhance the outstandingly remarkable plants. The report fails to include any information on whether sensitive plant populations are at viable levels or even what constitutes a viable population. The report does not indicate whether current survey data exists for these species within the Project area.  And finally, the report does not explain how the agency could assess or support the report's conclusion that the proposed activities would maintain viable populations of all sensitive plants without such information.

58. Numerous sensitive wildlife species are also known or suspected to occur within the Project area, including Pacific Fisher, Lewis woodpecker, North American wolverine, and the Gray Wolf.  The following Management Indicator Species (MIS) also inhabit the Project area: American marten, Northern Goshawk, Pileated woodpecker, Rocky Mountain elk, and multiple species of primary cavity excavators.

59. The Forest Service did not prepare a Biological Evaluation for sensitive wildlife.  Rather, the agency prepared an eight-page *draft* wildlife report.  This draft report did not substantiate how the Project is consistent with Forest Plan/River Plan management direction related to sensitive and ORV wildlife and MIS.  The report does not establish logging and related activities will protect and enhance the outstandingly remarkable wildlife.  The report provides virtually no analysis of the Project's adverse impacts to wildlife. For instance, research shows that American marten are associated with late-successional forest (mature and old trees) with closed canopies

(50-75% canopy closure) and higher densities of snags and down wood. Yet the draft report provides no explanation of how the proposed activities, which are designed to "open up" these forest stands (reducing canopy closure, current and future snags and down wood) will affect marten. The wildlife report does not include any information on these species' current population status or trend, or the quantity and quality of habitat necessary for maintaining viable populations within the planning area. The report also does not explain how it could assess or support the report's conclusion that the proposed activities would maintain viable populations of all these wildlife species without such information.

60. The draft wildlife report also did not include any information about the presence of or potential habitat for Spruce Grouse in the Project area. Spruce Grouse are a state listed sensitive species and in Oregon are currently only found in the northeastern region's Wallowa Mountains and Snake River divide. Spruce Grouse prefer mature forests with large trees and in the Wallowa Mountains are found in mixed coniferous forests dominated by lodgepole pine, subalpine fir, and Engelmann spruce. Logging both destroys Spruce Grouse habitat and increases its exposure to hunting.

61. Significant portions of the Lostine Project area qualify as "potential wilderness" because they are largely unmanaged and are contiguous with the designated Eagle Cap Wilderness.

62. Prior to commenting on the proposed Project, HCPC asked the Forest Service whether the Project would proceed using a CE or EA. The agency responded that there was no firm decision yet; the scoping comments would help inform the agency on how to proceed.

63. HCPC's subsequent comments emphasized that the Lostine Project should be thoroughly analyzed and subject to public review through documentation in an EA or EIS, rather than being categorically excluded from this NEPA process. HCPC explained the Project was not being

designed through a collaborative process and extraordinary circumstances exist that make the Lostine Project, as it was initially presented to the public, inappropriate for a CE under the "disease and insect" treatment program.

64. HCPC commented that the sensitive plant species in these moist mixed conifer forests are poorly adapted to frequent disturbance and impacts from heavy machinery.  The group requested that new botanical, moss, bryophyte, and fungi surveys be completed for every logging unit and disclosed to the public in the NEPA analysis.

65.  OW's comments similarly emphasized the significance of this area to people and wildlife, noting the vast number of outstandingly remarkable values that warrant the Forest Service taking a "light touch" management approach.  OW also spent considerable time referencing the Forest Service's duties under the Lostine River Plan.

66. In late May 2016, the Forest Service invited the public to attend a June 23, 2016 field visit to the Lostine Project area.

67.  At the site visit, HCPC learned for the first time the Forest Service intended to categorically exclude the Project from analysis in an EA or EIS.  The agency provided maps of the proposed units and roads to the participants, and flagged a proposed "patch" or clear-cut unit. Prior to this field trip, participants from the conservation community had no opportunity to review the Project's proposed design.  Still, Forest Service officials expected them to elucidate any concerns then and there.  The agency did not indicate whether there would be another opportunity for interested persons to get together and discuss ideas, concerns, or different ways of managing the area to improve public safety.

68. The Forest Service held an open house on July 14, 2016 to present the agency's design for the Lostine Project.

69. On or about September 14, 2016, HCPC asked the Forest Service for surveys, resource reports and other documentation supporting the agency's conclusions of the Project's impacts on plants, fisheries and wildlife.  The Forest Service declined to provide such information, noting that any reports were in draft form and surveys of sensitive plants were not released to the public.

70. On August 23, 2016, HCPC wrote a letter to the Regional Forester for the Forest Service's Pacific Northwest Region (Region 6), voicing concern with the Forest Service's lack of collaboration in developing the Project.  Also troubling was the Forest Service's mischaracterization of its engagement with the conservation community during the Project's development as an alleged transparent and collaborative process.

71. On August 23, 2016, OW wrote a letter to the Forest Supervisor regarding the lack of a collaborative process in designing the Project.  OW also took exception to the Forest Service's press statements suggesting the Project had been designed by a collaboration of many interests including conservationists.  OW asked the Supervisor to retract this statement because it implicated OW's involvement in a process that did not exist.

72. On October 28, 2016, OW attended a site visit to the Project area for Wallowa-Whitman Forest Collaborative members.  The Wallowa-Whitman Forest Collaborative is a formal collaborative that was established in 2012 and includes members that represent a diverse range of stakeholder groups, including members of HCPC, OW, and other conservation organizations. The Lostine Project was not proposed by nor developed through the Wallowa-Whitman Forest Collaborative.  During this site visit, OW continued to express concern about the lack of a collaborative process in developing the Lostine Project.

73. On November 22, 2016, HCPC wrote a letter to the Forest Supervisor.  Again, HCPC expressed frustration with the agency's insistence that the Project was developed using a transparent collaborative process involving the conservation community.

74. On February 22, 2017, the Forest Service, for the first time, posted on its website the "draft" Project details along with draft reports for wildlife, aquatics and botany.  At this time, the agency also posted a document entitled "Detailed Proposed Action" that included a reference to the "Decision Memo, p. 2," indicating the agency had already made its decision on or before this date.  The Forest Service did not solicit comments or other public input on these documents.

75. In late February 2017, District Ranger Stein told Plaintiffs the agency would not make its decision on the Lostine Project until it held a meeting with OW, HCPC and a small number of landowners in the Lostine area.

76. District Ranger Stein signed the Lostine Project Decision Memo on April 5, 2017, without holding the meeting with OW, HCPC and local landowners.

77.  The Decision Memo was electronically available on the agency's website on April 6, 2017.  In the Memo, the Forest Service admits that prior to this Project, the forests of the Lostine River corridor were "only lightly managed in an effort to avoid impacts to the corridor outstanding values."

78.  Rather than prepare an EA or EIS, the Forest Service chose to categorically exclude the Lostine Project from full NEPA analysis citing authority to do so under HFRA's "disease and insect" treatment program, established under HFRA sections 602 and 603.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**National Environmental Policy Act (NEPA) Violations**

79. The paragraphs above are incorporated herein by reference.

80. The Forest Service has violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations by authorizing the Lostine Project without first conducting the necessary analysis and by failing to take the requisite "hard look" at, and disclosing to the public, the adverse effects and potentially significant environmental impacts of the proposed action in an EA or EIS.

81. Specifically, "extraordinary circumstances" exist that render the Lostine Project ineligible as a "categorical exclusion" from a sufficient NEPA analysis.  The Project's approved logging and tree removal activities will adversely affect several special resource conditions that give rise to "extraordinary circumstances," which include but are not limited to: the congressionally designated Lostine Wild and Scenic River corridor and the "Outstandingly Remarkable Values" for which the river was designated; potential wilderness; numerous sensitive botanical species; sensitive aquatic and terrestrial species; and federally threatened fish species and their designated critical habitat.

82. At the very least, the Project's approved activities raise uncertainty over the degree of potential effects, which creates extraordinary circumstances and precludes the use of a CE, making an EA or EIS necessary. 36 C.F.R. § 220.6.

83. The Forest Service's failure to prepare an EA or EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA, 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### National Forest Management Act (NFMA) Violations

84. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

85. The Forest Service violated the National Forest Management Act, 16 U.S.C. § 1600 *et seq.*, and NFMA's implementing regulations in authorizing the Lostine Project, a site-specific action inconsistent with the governing Forest Plan.

86.  The Forest Service acted in violation of the Forest Plan, as amended by the River Plan, by failing to protect and enhance the congressionally designated Lostine Wild and Scenic River corridor and the corridor's ORVs, late-successional forest and old trees, riparian areas, threatened fish, and sensitive aquatic, wildlife and botanical species.

87. The Forest Service's action further violates the Forest Plan by authorizing silvicultural techniques within the river corridor that rely on the use of heavy, mechanized equipment that will adversely affect the corridor's ORVs, particularly sensitive and other remarkable plant species.

88.  Additionally, the Forest Service violated the Forest Plan by failing to prepare Biological Evaluations for sensitive plants and wildlife and failed to ensure the Project's adverse impacts would not cause a loss of viability to sensitive and management indicator species.

89. The Forest Service's failure to comply with the Forest Plan, including the River Plan, is arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA, 16 U.S.C. §§1604-1614, in violation of the APA, 5 U.S.C § 706(2)(A).

**THIRD CLAIM FOR RELIEF**
**Healthy Forests Restoration Act (HFRA) Violations**

90. Plaintiffs reallege all preceding paragraphs.

COUNT ONE

91. The Forest Service violated the Healthy Forests Restorations Act, 16 U.S.C. §§ 6501-6591, by categorically excluding the Lostine Public Safety Project pursuant to HFRA § 603 without developing the Project through a transparent and non-exclusive collaborative process that included multiple interested persons representing diverse interests.

92. The Forest Service's failure to use a transparent collaborative process at all, let alone one that included the conservation community, is arbitrary, capricious, an abuse of discretion, and not in accordance with HFRA, in violation of the APA, 5 U.S.C § 706(2)(A).

COUNT TWO

93. The Forest Service violated the Healthy Forests Restoration Act, 16 U.S.C. §§ 6501-6591, by categorically excluding the Lostine Public Safety Project pursuant to HFRA §603 when the Project is inconsistent with the Forest Plan, including the Lostine River Plan, as provided above in the Second Claim for Relief.

94. The Forest Service's failure to comply with the Forest Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with HFRA, in violation of the APA, 5 U.S.C § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare that the Forest Service's Decision Memo for the Lostine Public Safety Project violates NEPA and/or NFMA and/or HFRA and is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the APA;

B.  Vacate and set aside the Decision Memo for the Lostine Public Safety Project as illegal;

C.  Enjoin the Forest Service from implementing the Lostine Public Safety Project until the agency has complied with NEPA, NFMA and HFRA;

D.  Enter appropriate injunctive relief to insure the Forest Service complies with NEPA, NFMA and HFRA, and specifically to ensure that the Forest Service and its agents take no further action toward proceeding with the challenged Project until it has complied with NEPA, NFMA, and HFRA;

E. Award Plaintiffs their reasonable costs, litigation expenses, and attorney fees associated

with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*; and

F. Grant such further relief as the Court deems just and proper.

Respectfully submitted this 31st day of May 2017.

/s/ Jennifer Schwartz_____
Jennifer R. Schwartz, OSB #072978
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
jenniferroseschwartz@gmail.com

/s/ Jennifer R. Schemm
Jennifer R. Schemm, OSB #970086
Attorney at Law
602 O Avenue
La Grande, OR 97850
Tel: 541-910-4833
Fax: 541-962-7831
jschemm@eoni.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2017, I electronically filed the foregoing Complaint, Civil

Cover Sheet and Proposed Summonses with the Clerk of the Court using the CM/ECF system,

which will send notification of this filing to the attorneys of record.

/s/ Jennifer Schwartz_____

Jennifer R. Schwartz, OSB #072978
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
jenniferroseschwartz@gmail.com

*Of Attorneys for Plaintiffs*