IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

GREATER HELLS CANYON
COUNCIL, an Oregon nonprofit
corporation, and OREGON WILD, an
Oregon nonprofit corporation,

       Plaintiffs,

    v.

DISTRICT RANGER KRIS STEIN, in
her official capacity as District Ranger
of the Eagle Cap Ranger District,
Wallowa-Whitman National Forest,
and UNITED STATES FOREST
SERVICE, an agency of the United
States Department of Agriculture,

       Defendants,

   and

WALLOWA COUNTY, a political
subdivision of the State of Oregon,

Case No. 2:17-cv-00843-SU

**FINDINGS AND
RECOMMENDATIONS**

Intervenor-Defendant.
_____

SULLIVAN, United States Magistrate Judge:

Plaintiffs Greater Hells Canyon Council ("GHCC") and Oregon Wild bring this action to challenge the decision made by defendants United States Forest Service and District Ranger Kris Stein to approve the Lostine Public Safety Project ("Lostine Project" or "Project"). The Lostine Project is a fuels reduction project designed to restore forest health and reduce the risk of infestation and wildfire by thinning trees along the Lostine River in the Wallowa-Whitman National Forest ("WWNF") in Oregon. Defendant Forest Service approved the Lostine Project with a Decision Memo on April 5, 2017, signed by defendant Stein. The Decision Memo approved the Project via a categorical exclusion under § 603 of the 2014 Farm Bill amendments to the Healthy Forest Restoration Act. 16 U.S.C. § 6591b(a).

Wallowa County, Oregon, has intervened as a defendant. (Docket Nos. 9, 12). The American Forest Resource Council has filed an amicus brief. (Docket Nos. 40, 47).

Plaintiffs challenge the Decision Memo under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. Plaintiffs bring three claims for relief, for alleged violations of:

(1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, because "extraordinary circumstances" preclude use of the Farm Bill categorical exclusion ("CE");

(2) the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, because the Lostine Project is not consistent with the Wallowa-Whitman Land and Resource Management Plan ("Forest Plan") or the Lostine River Wild and Scenic River Management Plan ("Lostine River Plan"); and

(3) the Healthy Forests Restoration Act ("HFRA"), 16 U.S.C. §§ 6501-6591, because the Project was not developed through a transparent and non-exclusive collaborative process, and because the Project is inconsistent with the Forest and River Plans.

The parties have filed cross-motions for summary judgment. (Docket Nos. 27, 38, 39).

Plaintiffs moved to modify the deadline to file a motion to supplement the Administrative Record with extra-record evidence, and also to consider extra-record evidence or to supplement the Administrative Record. (Docket Nos. 42, 43). At a Motion Hearing on January 22, 2018, the Court denied plaintiffs' Motions (Docket No. 52); however, the Court ordered supplemental briefing by the parties regarding the appropriateness of the Court's consideration of plaintiffs' submission of extra-record evidence which had been submitted with plaintiffs' opening Motion for Summary Judgment (Docket Nos. 27-37, 53, 56).

The Court heard oral argument on the parties' cross-motions for summary judgment on March 20, 2018. (Docket Nos. 57, 59).

For the follow reasons, the Court should DENY plaintiffs' Motion for Summary Judgment, and GRANT defendant and intervenor-defendant's Motions for Summary Judgment.

## BACKGROUND

The Lostine Project is a fuels reduction project intended to restore forest health and reduce the risk of insect infestation and wildfire along the Lostine River by thinning trees. The sixteen-mile stretch of the Lostine River is designated a wild and scenic river under the Wild and Scenic River Act ("WSRA") due to its free-flowing nature and outstandingly remarkable values ("ORVs") for scenery, recreation, fish, wildlife, and vegetation and botanical features. AR 2169 (River Plan), 2266 (River Plan Environmental Assessment). The public lands in and along the river and river corridor are managed under the 1990 Forest Plan and 1993 River Plan. AR 1537-

1728 (Forest Plan), 2165-2254 (River Plan).  When the River Plan was adopted, the Forest Service recognized that the forest stands were in a poor state of health and subject to increasing insect and disease damage, due to age, density, fire exclusion, and selective timber harvesting. AR 2225, 2269, 11197-99 (Lostine Project Public Safety and Fuels).

The Wallowa County 2006 Community Wildfire Protection Plan identifies the Lostine River as a priority wildland-urban interface ("WUI") area.  AR 6843.

The Project lies within the eleven-mile Lostine River Corridor, designated an area in declining health under the 2014 Farm Bill amendments to the HFRA.  AR 9041.  This designation allows for projects to reduce the risk of insect infestation, improve forest resilience, and restore ecological integrity of the forest.  *Id.*; 16 U.S.C. § 6591a.

The Project was approved by the Decision Memo on April 5, 2017.  AR 11243-44.  The Project involves tree thinning, mitigation of hazard trees, removal of hazardous fuels, and creations of small openings.  AR 11244, 11246-47, 11257, 11268-73 (Decision Memo and Appendices).  The Decision Memo provides that mechanized equipment will not be operated in Riparian Habitat Conservation Areas ("RHCAs").  AR 11257.  Additionally, approximately 1.5 miles of temporary roads will be developed, but will be decommissioned within three years of project completion.  AR 11248.  Any downed wood from thinning will be machine piled, except in RCHAs. AR 11259.  Fuels thinning will be done by hand.  AR 11244, 11247.  Hazard tree mitigation will occur along roads and near developed sites and the trees will be felled by hand or with mechanized equipment.  AR 8474 (Field Guide for Hazard-Tree Identification and Mitigation on Developed Sites in Oregon and Washington Forests), 11247, 11259-60.  The small group openings consist of patch-cut treatments, two as fuel breaks patches and one for a helispot. AR 11247-48.

The Forest Service decision to proceed with the Project was based on numerous reports: the Heritage and Cultural Resources Report, AR10806-08; the Aquatics Report, AR10809-919; the Invasive Species Report, AR10920-22; the Recreation Resources Report, AR10923-28; the Scenic Resources Report, AR1029-33; the Soil Report, AR10934; the Wild and Scenic Rivers Act Section 7(a) Evaluation, AR10935-40; the Wildlife Report, AR10941-48; the Botanical Report, AR10949-56; and the Boundary Identification, AR10492-95.

The Aquatics Biological Evaluation analyzed each threatened or endangered species in the Project area, and concluded that the Project "May Impact Individuals or Habitat" ("MIIH") but would not likely contribute to a trend towards a federal listing or cause a loss of viability for sensitive species. AR 10809, 10830-52, 10919. The Wildlife Report found no listed, proposed, threatened or endangered species, or any critical or proposed habitat, within the project area; the Report found that effects to management indicator species were expected to be short-term, and included mitigation measures for these effects; and it found that indirect and long-term effects were expected to benefit and enhance habitat for wildlife that utilize mature open stands. AR 10941-48. The Botanical Report analyzed every sensitive plant species, determined either "no impact" or "MIIH" for each species, and included mitigation measures. AR 10953-56. The Section 7(a) WSRA Evaluation found that the Project would not directly affect the free-flowing character of the Lostine River, and reviewed possible impacts for each of the five Outstanding Remarkable Values ("ORVs") for which the River was designated; it found that short-term impact was expected for scenic and recreational values, but that long-term there would be improvement; it found that the other values would have minimal or no negative impacts. AR 10935-40.

**LEGAL STANDARD**

Under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, a court "shall" set aside any agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quotations omitted). "As a reviewing court, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quotation omitted). "To have not acted in an arbitrary and capricious manner, the agency must present a rational connection between the facts found and the conclusions made." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (quotation omitted). "[W]here the agency's reasoning, although complex, is rational, clear, and complete, [the court] must affirm. Contrarily, where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, [the court] must disapprove the agency's action." *Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A.*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (quotation omitted). "Although [the court's] inquiry must be thorough, the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601; *Lands Council v. McNair (Lands Council I)*, 537 F.3d 981, 987 (9th Cir) (citation and quotation omitted).

Agency action "[n]ormally" "is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[A]n agency's decision can be upheld only on the basis of the reasoning in that decision." *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

## ANALYSIS

### I.     Plaintiffs' Extra-Record Evidence

With their initial motion for Summary Judgment filed on November 11, 2017, plaintiffs submitted ten extra-record declarations, seeking to supplement the Administrative Record. (Docket Nos. 27-37). According to federal defendants, plaintiffs provided them with no notice that plaintiffs would be seeking to supplement the record or would be relying on extra-record evidence. Fed. Defs. Resp., at 2-3 (Docket No. 45). Federal defendants, in their Cross-Motion for Summary Judgment (Docket No. 38), requested the Court strike the extra-record evidence. (Docket No. 38). Plaintiffs did not address defendants' arguments in their Reply brief. Instead, a week before their briefing was due, plaintiffs moved to modify the October deadline and to file a motion to supplement the Administrative Record with extra-record evidence (Docket No. 42); simultaneously, plaintiffs moved to consider extra-record evidence or, in the alternative, to supplement the administrative record (Docket No. 43). The Court held a Motion Hearing on January 22, 2018, to consider plaintiffs' Motions. For the reasons stated at the Hearing, the Court denied plaintiffs' Motions. (Docket No. 52). The Court ordered the parties to submit supplemental briefing on plaintiffs' submission of extra-record evidence, and stated it would consider these arguments, and plaintiffs' submissions, along with the Cross-Motions for Summary Judgment.

For the following reasons, the Court should STRIKE plaintiffs' extra-record evidence.

## A. Consideration of Extra-Record Evidence under the Administrative Procedure Act

Courts reviewing an agency decision are limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). "Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). This general rule derives from the court's statutory role to review an agency's action. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *see Fla. Power & Light Co.*, 470 U.S. at 743-44 ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court.").

There are "narrow exceptions" to this rule, present in "limited circumstances." *Lands Council*, 395 F.3d at 1030:

> [D]istrict courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*Lands Council*, 395 F.3d at 1030 (quotations omitted). "These limited exceptions operate to identify and plug holes in the administrative record. Though widely accepted, these exceptions are narrowly construed and applied." *Id.* "The scope of these exceptions permitted by our precedent is constrained, so that the exception does not undermine the general rule. Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, de novo rather than with the proper deference to agency processes, expertise, and decision-making." *Id.* "[T]he party

seeking to admit extra-record evidence initially bears the burden of demonstrating that a relevant exception applies." *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993.

The district court's decision to expand the administrative record is reviewed for abuse of discretion. *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1447.

### B. Plaintiffs' Extra-Record Submissions

Plaintiffs have submitted the following extra-record declarations:

Ralph Anderson, a former forestry technician with the U.S. Forest Service, testifies about wildlife species in the Lostine River Canyon, their habitats, and the likely effects of the Lostine Project on those species. Anderson Decl. ¶¶ 3, 8-13 (Docket No. 28).

Richard Bailey, former executive director of Greater Hells Canyon Council, and also a former U.S. Forest Service firefighter, provides opinions on how the Lostine Project should have been planned and developed, the Project's shortcomings in protecting forest health, the allegedly exaggerated urgency for action contained in the Decision Memo, and the failure to employ a collaborative process. Bailey Decl. ¶¶ 3, 4, 12, 19, 36, 44 (Docket No. 29).

Maria Belknap, a Greater Hells Canyon Council member, landowner in the Lostine Canyon, and former U.S. Forest Service ranger, reports on her communications with defendants during planning of the Lostine Project, including her voicing multiple concerns during that process. Belknap Decl. ¶¶ 1, 2, 8-13 (Docket No. 30).

Darilyn Brown, executive director of Greater Hells Canyon Council, testifies about the council, and its participation in planning of the Lostine Project, including communications with defendants. Brown Decl. ¶¶ 1, 4-7, 11-20 (Docket No. 31).

Cindy Johnson, a professor of biology and environmental studies, provides detailed information about the *Botrychium*, or moonwarts, including habitat and population, and the impact of various forestry techniques. Johnson Decl. (Docket No. 32).

Brian Kelly, restoration director for Greater Hells Canyon Council, opines that the Lostine Project was not developed using a collaborative process, and also critiques forestry techniques approved by the Project. Kelly Decl. ¶¶ 2, 14-18, 22-30 (Docket No. 33).

Richard Klavins, an Oregon Wild field coordinator, provides information about Oregon Wild and the Wallowa-Whitman Forest Collaborative Group, and about Oregon Wild's participation in planning of the Lostine Project. Klavins Decl. ¶¶ 3, 12, 14-40 (Docket No. 34).

Deborah Richie, a member of both plaintiffs Greater Hells Canyon Council and Oregon Wild, offers strongly worded criticisms of defendants and of the Lostine Project. Richie Decl. ¶¶ 2, 7-11, 13-18 (Docket No. 35).

Carrie Roth, an Oregon Wild member and homeowner near the Lostine Corridor, testifies about her attempts to provide feedback on the Lostine Project. Roth Decl. ¶¶ 2, 3, 8-13 (Docket No. 36).

Veronica Warnock, the GHCC conservation director, reports on GHCC's communications with defendants during Project planning, and opines that defendants did not use a collaborative process. Warnock Decl. (Docket No. 37).

Plaintiffs also cite websites in their briefing, with purported background information on various wildlife and botanical species.

**C.    Application to Plaintiffs' Submitted Extra-Record Evidence**

First, plaintiffs' extra-record evidence, to the extent it addresses whether defendants engaged in a transparent, non-exclusive collaborative process under the Farm Bill CE, 16 U.S.C.

§ 6591b, does not fall into any of the *Lands Council* exceptions, should not be considered, and should be stricken. The evidence does not relate to whether the Forest Service considered all factors in applying the CE, does not address the Forest Service's explanation in approving the Decision Memo, does not constitute documents the Forest Service relied upon, does not explain technical or complex matters, and does not show bad faith. The Administrative Record contains ample documentation of the collaborative process that federal defendants employed, as discussed below. Plaintiffs' attempt to create a factual dispute regarding collaboration is misplaced in an APA matter to be decided at summary judgment on the record. None of the proffered extra-record evidence could have been provided to the Forest Service during the administrative process, and so is also not proper on district court review. The Court's job is not to take additional evidence and engage in fact-finding about the Forest Service's actions. *See Lands Council*, 395 F.3d at 1030. The "exceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (alteration and quotation omitted). "Post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision because it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Id.* at 1130-31; *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450 ("Post-decision declarations offered to either justify or attack an agency decision already made should not be considered.")

Next, plaintiff's extra-record evidence, to the extent it challenges the Botanical and Wildlife Reports, is improper, should not be considered, and should be stricken. Plaintiffs argue that their declaration and website scientific evidence plugs gaps in the Administrative Record, regarding the location of rare species, wildlife habitats, species-specific information, treatment of

hazard or danger trees, and discussion of avoidance as an effective mitigation. However, plaintiffs' submissions are an attempt to provide an alternate and preferred version of the facts in order to persuade the Court that the Forest Service's decision was in error. This is precisely the type of extra-record evidence that the court may not consider. "The first *Lands Council* exception—the 'relevant factors' exception—is the most difficult to apply . . . ." *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993. "Although the relevant factors exception permits a district court to consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis, the exception does not permit district courts to use extra-record evidence to judge the wisdom of the agency's action." *Id.* "Reviewing courts may admit evidence under this exception only to help the court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious. But reviewing courts may not look to this evidence as a basis for questioning the agency's scientific analyses or conclusions." *Id.* (citations omitted).[1] The material is also not of a complexity that requires additional explanation for the Court. *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 704 (9th Cir. 1996), *as amended* (July 15, 1996) ("[Plaintiff environmental groups'] materials are not necessary to explain technical terms or complex subject matter; the documents in the administrative record are not overly technical, nor does [plaintiff] explain how its materials are any less complex."). Further, as to the purported gaps in the Record argued by plaintiffs, or factors that defendants allegedly failed to consider, the

---

[1] "[T]he district court violated [Ninth Circuit precedent] when it used several extra-record declarations to question [the agency's] scientific judgments. [T]he district court here relied on the declarations of the parties' experts-as-advocates as the basis for rejecting the [Biological Opinion]. In this way, the district court overstepped the bounds of *Lands Council* by opening the administrative record as a forum for the experts to debate the merits of the [Biological Opinion]." *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993 (alteration, citation, and quotation omitted).

Administrative Record includes extensive, relevant analyses. *E.g.*, AR 6218-41 (study by Forest Service botanist of moonwort monitoring); 6229-30 (documenting identified plant sites); 7329-85 (moonwort conservation assessment); 9963-10085 (Field Guide for Danger-Tree Identification and Response along Forest Roads and Work Sites in Oregon and Washington); 10941-48 (analyzing wildlife habitats); 10951-60 (noting presumptions about plant disturbance and mitigation, and adopting avoiding of known sites with monitoring); 10953-56 (acknowledging that some impact to individual plants may occur); 11243-56 (addressing hazard and danger tree removal in the Decision Memo); 11259-62 (discussing hazard tree mitigation); 11263 ("Reduce resource impacts to sensitive resources by conducting certain types of implementation during winter time or similar conditions."); 1139-43 (referencing sources for numerous species, including fact sheets with detailed information on each species); 1192-96 (species specific sources and data). *See Sw. Ctr. for Biological Diversity*, 100 F.3d at 1451 (holding that extra-record information that can "either be extracted from the record or is not necessary to th[e] court's review of the Forest Service's action" was properly excluded).

The Court should not consider plaintiffs' extra-record evidence on the parties' Motions for Summary Judgment and should STRIKE the evidence.

## II.    National Environmental Policy Act Claim

Plaintiffs contend that defendants violated NEPA by improperly approving the Lostine Project via the Farm Bill Categorical Exclusion ("CE") because "extraordinary circumstances" exist which preclude use of a CE, and require instead preparation of either an Environmental Impact Statement ("EIS") or Environmental Assessment ("EA").

## A.     The National Environmental Policy Act

"NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing NEPA § 101, 42 U.S.C. § 4331).

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Id.* at 349.  "Alternatively phrased, the task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).   "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

If proposed agency action "*may* have a significant effect on the environment," the agency must prepare an "Environmental Impact Statement" ("EIS"), which provides a "detailed" analysis. *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (italics added, quotation omitted) (citing 42 U.S.C. § 4332(2)(C)); 40 C.F.R. §§ 1501.4(a)-b), 1508.11.   Alternately, regulations permit agencies to prepare "a more limited document," an "Environmental Assessment" ("EA"), which is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 997 (9th Cir. 2013) (quoting 40 C.F.R. § 1508.9(a)).  "Where the effects on the human environment are 'highly uncertain or involve unique or unknown risks,' however, the agency must prepare an EIS." *Id.* (quoting 40 C.F.R. § 1508.27(b)(5))

NEPA regulations provide that, if agency action falls under a "categorical exclusion" ("CE"), the agency need not prepare an EIS or EA. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (citing 40 C.F.R. § 1508.4). CE's are "categories of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.* (citing 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4). "Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013). Agency action may fall within a CE but still "may have a significant environmental effect" such that "extraordinary circumstances" preclude use of a CE, and at minimum an agency must prepare an EA. 40 C.F.R. § 1508.4; *Ctr. for Biological Diversity*, 706 F.3d at 1096-97; *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002).

Forest Service regulations establish a two-step process to determine whether extraordinary circumstances exist. 36 C.F.R. § 220.6(b); *Hells Canyon Pres. Council v. Connaughton*, No. 3:11-cv-00023-PK, 2013 WL 665134, at *5 (D. Or. Feb. 22, 2013). First, the Forest Service must determine whether certain special resource conditions exist in the action area. *Id.* These resource conditions include:

> (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
> (ii) Flood plains, wetlands, or municipal watersheds;
> (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas; . . .

36 C.F.R. § 220.6(b)(1).

Second, if any of these resource conditions are present, the Forest Service must assess the degree of potential effect of the proposed action on the resource condition. *Id.* at § 220.6(b). If

the proposed action may have a significant environmental effect, the agency must prepare an EIS. *Id.* § 220.6(c). If the Forest Service is uncertain whether the proposed action may have a significant effect, it must prepare an EA. *Id.* "[O]nly where the potential effect on the resource condition is known to be insignificant does the action comply with the Forest Service's policy on extraordinary circumstances. And, therefore, only where the potential effect is known to be insignificant may the Forest Service apply a CE." *Hells Canyon Pres. Council v. Connaughton*, No. 3:11-cv-00023-PK, at *6 (citing 36 C.F.R. § 220.6(c)).

**B.      Use of the Farm Bill Categorical Exclusion**

Congress has also created categorical exclusions by statute, rather than regulation. The 2014 Farm Bill amendments to the HFRA, 16 U.S.C. §§ 6591a, 6591b, create such a statutory CE. These amendments provide that certain projects "may be—(1) considered an action categorically excluded from the requirements of Public Law 91-190 (42 U.S.C. 4321 et seq.)," *i.e.*, from NEPA. 16 U.S.C. § 6591b(a)(1). The 2014 Farm Bill amendments list the statutory requirements for application of this statutory CE:

> a project to carry out forest restoration treatments that—
> (A) maximizes the retention of old-growth and large trees . . . ;
> (B) considers the best available scientific information to maintain or restore the ecological integrity . . . ; and
> (C) is developed and implemented through a collaborative process that—
>      (i)  includes multiple interested persons representing diverse interests . . . .

*Id.* § 6591b(b)(1). The statute also limits projects under this CE to those (1) not exceeding 3,000 acres, (2) in the wildland-urban interface ("WUI"), and (3) not establishing permanent roads, and decommissioning any temporary roads within three years of project completion. *Id.* § 6591b(c).

Plaintiffs argue that the statutory CE created by the 2014 Farm Bill amendments is additionally subject to the general NEPA "extraordinary circumstances" review. Plaintiffs base this argument on Congress' use of the word "may" in the Farm Bill amendments. The

amendments provide that certain projects "*may* be . . . considered an action categorically excluded from the requirements." 16 U.S.C. § 6591b(a)(1) (emphasis added). Plaintiffs argue that these projects "*may*" be subject to a CE only if they additionally satisfy "extraordinary circumstances" review.

Defendants argue that the 2014 Farm Bill amendments create a separate, independent, statutory CE not subject to "extraordinary circumstances" review." They argue that "*may*" simply means that the action is subject to the statutory CE if it meets the statutory requirements contained in § 6591b.

Plaintiffs' reading of the 2014 Farm Bill amendments in conjunction with NEPA regulations is not implausible. The statute, for example, does not say "*shall* be considered an action categorically excluded" from NEPA, which would more clearly preclude "extraordinary circumstances" review.

However, the Court concludes that defendants' reading of the statutory CE as not subject to "extraordinary circumstances" review is the better interpretation, for multiple reasons. First, the plain language of § 6591b, the Farm Bill amendments, does not specifically state any requirement for "extraordinary circumstances" review. Courts should "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009). Second, the regulatory categorical exclusion definition, which requires "extraordinary circumstances" review, by its terms limits its application to those regulatory provisions only: "Any procedures *under this section* shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. "Under this section" should not be read as applying to a separate statutory provision, such as the Farm Bill amendments CE. Third, § 6591b is silent on whether it

incorporates "extraordinary circumstances" review, but it includes its own limitations on application of the CE, at §§ 6591b(b) and (c), as cited above.  This creates the presumption that these are the only limitations on applying the CE, and that additional limitations should not be read into the statute.   Fourth, Congress has shown that it can apply "extraordinary circumstances" review when it so wishes: HFRA § 404, 16 U.S.C. § 6554, provides that certain treatments "*may* be categorically excluded" from NEPA review, *id.* at § 6554(d)(1), but further states that this CE "shall be subject to the extraordinary circumstances procedures established by the Secretary pursuant to section 1508.4 of title 40, Code of Federal Regulations," *id.* § 6554(d)(2)(B).  Where Congress expressly extended "extraordinary circumstances" review to one section of HFRA but not another, it is apparent that Congress did not intend to require "extraordinary circumstances" review under that other section, i.e., § 6591b.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).[2]

The Court thus concludes that "extraordinary circumstances" review does not apply to actions categorically exempt under the 2014 Farm Bill amendments, 16 U.S.C. § 6591b, and the Forest Service was not required to determine whether extraordinary circumstances required preparation of an EIS or EA.[3]

---

[2]  Intervenor supplied additional support for this argument.  *See* Inter. Suppl. Authority (Docket No. 60).

[3] The Court is not persuaded by the analysis on *Center for Biological Diversity v. Ilano*, 261 F. Supp. 3d 1063 (E.D. Cal. 2017).  The court there stated only that it "seems" that extraordinary circumstances review would apply, that "[p]erhaps" that is why the Forest Service conducted such review in that instance, and that "since it seems like the law requires such review, this

## III.    National Forest Management Act Claims

Plaintiffs argue that the Decision Memo violates NFMA because it is inconsistent with the Wallowa Whitman National Forest ("WWNF") Forest Plan, as amended by the Lostine River Plan.

### A.    National Forest Management Act

"The NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (citing 16 U.S.C. § 1604). First, the Forest Service develops a Land and Resource Management Plan (a "forest plan"), containing "broad, long-term plans and objectives for the entire forest." *Id.* It then implements the forest plan through site-specific projects." *Id.* The NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands" be consistent with the forest plan. 16 U.S.C. § 1604(i).

"Procedurally, all management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the NFMA." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 (9th Cir. 2010) (quotation omitted).

> Substantively, the NFMA also places a duty on the Forest Service to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area . . . ." 16 U.S.C. § 1604(g)(3)(B). In order to ensure compliance with the forest plan and the NFMA, the Forest Service must conduct an analysis of each "site specific" action, such as a timber sale, to ensure that the action is consistent with the forest plan.

---

ruling *will assume for purpose of analysis* that such review was indeed required." *Id.* at 1068-69 (italics added).

*Id.* (quotation omitted). "Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components . . . ." 36 C.F.R. § 219.15(d).

"While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Weldon*, 697 F.3d at 1056; *see also Ecology Ctr. v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009).

**B.     Wild and Scenic Rivers Act**

The WSRA creates a National and Wild Scenic River system ("River System") for designated rivers and river segments. 16 U.S.C. §§ 1272-73. The WSRA imposes procedural and substantive requirements on the agencies responsible for administering designated areas. *See Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793-94 (9th Cir. 2003), *opinion clarified*, 366 F.3d 731 (2004); *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1027-28 (9th Cir. 2008). Agencies administering a River System must protect and enhance the free-flowing condition, water quality, and outstanding recreational values ("ORVs") of designated rivers and river segments. 16 U.S.C. §§ 1271, 1278. The WSRA requires preparation of "a comprehensive management plan for [designated] river segment[s] to provide for the protection of the river values," *id.* § 1274(d)(1), that is, a "river plan." This "plan shall address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of" the WSRA. *Id.*

**C.     Consistency with the Wallowa-Whitman National Forest Forest Plan**

        <ins>1.</ins>     <ins>Wallowa-Whitman National Forest Forest Plan Directives</ins>

The Wallowa-Whitman National Forest Forest Plan contains directives for wildlife, botany and vegetation, and threatened or sensitive species:

"Prepare a biological evaluation during the environmental analysis of each project to determine possible effects of the proposed activity on threatened, endangered, and sensitive species," AR 1628;

[Review all actions and programs] "to determine their potential effects on threatened, endangered, and sensitive species. Conduct these reviews, including biological evaluations, per direction in FSM 2670 and appropriate R-6 manual supplements," AR 1627-28;

"[P]rovide habitat for viable populations of all existing native and desired nonnative vertebrate wildlife species," AR 1599, 1641; and

"[t]o protect and manage habitat for the perpetuation and recovery of plants, animals, and invertebrates which are listed as threatened, endangered, or sensitive." AR 1599, 1627; *see also* AR 1561-63, 1706-07.

2. <u>Sufficiency of the Biological Evaluations for Sensitive Plants and Wildlife</u>

Plaintiffs first argue that the Project is inconsistent with the WWNF Forest Plan, and thus that defendants violated the NFMA, because the Forest Service did not prepare a biological evaluation for sensitive plants and wildlife in accordance with Forest Service Manual ("FSM") 2670. AR 7727-50. FSM 2672.42 requires that biological evaluations:

(1) identify all listed, proposed, and sensitive species known or expected to be in a project area;

(2) identify all occupied and unoccupied habitat recognized as essential for listed or proposed species recovery, or meet Forest Service objectives for sensitive species;

(3) analyze effects of a proposed action on species or their occupied or unoccupied habitat;

(4) discuss the results of a planned project in relationship to existing conditions and other related projects;

(5) determine whether no effect, beneficial effect, or "may" effect applies to the species and rationale for a determination;

(6) recommend removal, avoidance, or compensation for any adverse effects; and

(7) reference any information consultation with the Fish and Wildlife Service, contacts, contributors, sources of data, and literature references used in developing a biological evaluation. AR 7734-35.

The Wildlife and Botanical Reports meets these requirements. *See* AR 10941-48 (Wildlife Report); AR 10949-56 (Botanical Report). The Reports identify species expected to be in the Project area, AR 10942-47, 10953-56; identify essential habitat, AR 10942-47, 10953-56; analyze effects, AR 10946-47, 10953-56; discuss existing conditions, AR 10942-45, AR 10950-51; and make a determination regarding effects, AR 10946-47, 10953-56.

Plaintiffs argue that the Reports fail to meet the requirements of a biological evaluation, relying on *Oregon Natural Resources Council Fund v. Goodman*, 505 F.3d 884 (9th Cir. 2007). However, *Goodman* is distinguishable from the present case, and thus does not establish governing standards for the contents of a biological evaluation here. *Goodman* concerned a biological evaluation prepared in conjunction with a final environmental impact statement under NEPA. Such an evaluation is subject to far more detailed administrative review than that applicable here given the Forest Service's use of a categorical exclusion. *Id.* at 887-88. The court found that the biological evaluation in *Goodman* improperly failed to contain necessary

updates when a sensitive species was found in the project area, and improperly used habitat as a proxy for population, *id.* at 890-91.  Neither of those factors exist in this case.  Plaintiffs cite no authority to support their objections regarding any requirement that the biological evaluation quantify habitat pre- or post-Project, or determine the quality and quantity of habitat essential for meeting agency objectives for sensitive species.  Nor do they provide support for a requirement that reports be labeled as drafts or as biological reports, nor that references to certain data not be removed from a draft, nor that reports contain certain personnel information.  Other than *Goodman*, which does not apply here, plaintiffs have not cited authority establishing that these would constitute biological evaluation requirements under FSM 2670.

The Forest Service satisfied FSM 2670's biological evaluation requirements, and did not violate the WWNF Forest Plan, or the NFMA.

### 3.     Species Viability and Recovery

Second, plaintiffs argue that the Project is inconsistent with the WWNF Forest Plan because the Project does not ensure species viability and recovery.  However, the Wildlife and Botanical Reports do analyze species viability.  AR 10941-47, 10949, 10952-56.  The Reports find that any impact to the species would not likely contribute to a trend toward federal listing or cause a loss of viability to the population or species.  *Id.*  The fact that there could be some habitat disturbance does not necessarily mean that a species' viability would be threatened. "That a proposed project involves some disturbance to the forest does not prohibit the Forest Service from assuming that maintaining a sufficient amount of suitable habitat will maintain a species' viability."  *The Lands Council v. McNair*, 537 F.3d 981, 998 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

Plaintiffs criticize the Project for failing to base its conclusions on actual population monitoring data, the use of habitat as proxy for species viability determinations, a determination of what constitutes viable populations, current population status or trends, frequency of species, or quantity and quality of habitat necessary to sustain a viable population. Plaintiffs have not identified where in the Forest Plan directives such analyses or specific types of data would be required of defendants. Plaintiffs improperly rely on *Goodman*, 505 F.3d 884, which is distinguishable and not controlling for the reasons stated above, and *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006), which is similarly distinguishable because it concerned a final environmental impact statement. Plaintiffs' identify specific types of data, and specific modes of analysis, that they prefer defendants had used. However, plaintiffs' preferences do not make defendants' conclusions irrational, unclear, or unsupported, nor make agency action arbitrary or capricious. "To always require a particular type of proof that a project would maintain a species' population in a specific area would inhibit the Forest Service from conducting projects in the National Forests." *Lands Council*, 537 F.3d at 997. Plaintiffs also argue that the Forest Service's conclusions about viability are unreasonable given other scientific evidence. However, this argument relies on the extra-record evidence plaintiffs have improperly sought to introduce, and thus is not a basis for reversing agency action.

The Forest Service did not violate the WWNF Forest Plan, or the NFMA, by failing to ensure species viability and recovery.

**D. Consistency with the Lostine River Wild and Scenic River Plan**

**1. Lostine River Wild and Scenic River Plan Requirements**

The NFMA requires the Lostine Project to be consistent with the WWNF Forest Plan, as amended by the Lostine River Wild and Scenic River Management Plan. 16 U.S.C. § 1601(i);

AR 2165-2254 (River Plan). The River Plan requires that, *inter alia*, "[w]ithin the Recreational section of the river, timber will be harvested to protect and enhance OR [outstanding remarkable] values, for public safety, and for emergency conditions such as insect infestations, disease control, fire and other natural catastrophe. This will be a non-scheduled timber harvest activity." AR 2173. Also, "Management direction for the river corridors will provide protection in the following ways: . . . Outstandingly remarkable values of the river must be protected and enhanced." AR 2179-80. As to forestry techniques,

> Utilize a full range of silvicultural techniques for improving forest health with an emphasis towards uneven-age management. Utilize thinning from below, underburns, and other methods to improve forest health that do not rely on the use of heavy equipment on site. Emphasis shall be on long-term forest health rather than short-term.

AR 2179.

### 2. Consistency with the River Plan

The Forest Service reviewed potential impacts to ensure protection and enhancement of ORVs (outstanding remarkable values) in its Wild and Scenic Section 7(a) Evaluation. AR 10935-40. It addressed mitigation measures as to each ORV where there would be impact: It found there would be no effects on the free-flowing character of the Lostine River. AR 10937-39. It found that impact on scenic qualities would be short term, and it incorporated mitigation measures to improve scenic values. AR 11264-66, 10937. It found only short-term impact on recreational values, and that long-term the Project will enhance this ORV by making the project area safer and more scenic. AR 10938. The Evaluation and the Aquatics Report analyze fisheries, and determine they will be protected because the Project will reduce risk of insect, disease, and fire to forest stands, thereby protecting riparian features. AR 10843-46, 10937-38, 10809-919. The Evaluation notes that proposed activities may decrease stand density, thus

potentially affecting wildlife, but that this modification will occur in less than 1% of the available habitat in the Project watershed, and therefore will not have a measurable effect on individual animals. AR 10939, 11247. The Wildlife and Botanical Reports analyzed sensitive and indicator species in the area to find that any impact will be minimal or nonexistent. AR 10941-48, 10949-56.

Plaintiffs offer various arguments why the Lostine Project is not consistent with the River Plan, and thus violates the NFMA. None is successful.

First, plaintiffs repeat their argument that because there may be some harm to sensitive or ORV plans, the Project will not protect or enhance ORVs. However, the occurrence of some harm to individual plants is not the same as an overall failure to protect or enhance ORVs; protection or enhancement of ORVs does not require that the Project succeed perfectly in causing no harm to any individual plant. *See Lands Council*, 537 F.3d at 998.

Second, plaintiffs argue that the Project has insufficient mitigation measures. However, while the final decision did not adopt all of the District botanist's recommended mitigation measures, this does not mean that the mitigation measures adopted are insufficient. It merely means that defendants chose one set of mitigation measures over another, not that the ones chosen were done so arbitrarily or capriciously. Plaintiffs criticize the final decision for not requiring stand monitoring, buffering around sites of known sensitive species, or winter logging restrictions, but plaintiffs cite no authority that such mitigation measures are required, or that failure to implement them amounts to a failure to enhance or protect ORVs.

Third, plaintiffs argue that thinning and grapple piling proposed for the logging activities have the potential to harm rare plants. As support for this argument, however, plaintiffs rely on

extra-record evidence regarding the effects of such logging activities. This evidence is not properly before the Court or considered on review of agency action.

Finally, plaintiffs argue overall that proposed logging activities will not protect and enhance the corridors wildlife and fisheries ORVs, because of a reduction in forest density, the operation of industrial-scale logging equipment, and the construction of spur roads. These broad arguments do not show that the final decision was arbitrary and capricious in determining that the Project's authorized activities would protect and enhance ORVs. Plaintiffs have not established that reduction in density, operation of equipment, or construction of spur roads is incompatible with ORV protection and enhancement, nor provided authority that the River Plan excludes these activities. That the Forest Service cannot prevent all harm to any ORV species, or assure that populations will not be downgraded, does not mean that the Forest Service could not determine that overall, long-term, the Project would protect and enhance ORVs. Plaintiffs again rely on their extra-record evidence in bringing these arguments, not citation to the record or to legal authority. Moreover, plaintiffs rely on an incomplete citation of the River Plan's directive: plaintiffs omit that the River Plan contemplates timber harvests "and for emergency conditions *such as insect infestations, disease control, fire and other natural catastrophe*." AR 2173 (emphasis added). The Decision Memo states that "[t]he purpose and need of this project is to reduce the current and future risk of insect and disease impacts. This in turn will reduce risks to people, developments, private property, and forest resources, including outstanding river values." AR 11244. Defendants were permitted to consider the Project's effects in addressing these emergency conditions and whether the Project would protect and enhance ORVs. Defendants appropriately determined that reduction of those emergency conditions would contribute to ORV protection and enhancement.

**IV.** **Healthy Forest Restoration Act Claims**

Plaintiffs argue that the Lostine Project violates the HFRA for two reasons: (1) it is inconsistent with the WWNF Forest Plan and Lostine River Plan, and (2) it was not developed using a transparent and non-exclusive collaborative process, as the Farm Bill CE requires.

**A.** **Compliance with Forest Plan and River Plan**

The Healthy Forest Restoration Act provides as follows:

To qualify for the HFRA CE, a project must meet certain statutory conditions:

(A)     maximizes the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease;

(B)     considers the best available scientific information to maintain or restore the ecological integrity, including maintaining or restoring structure, function, composition, and connectivity; and

(C)     is developed and implemented through a collaborative process that--

     (i)     includes multiple interested persons representing diverse interests; and

     (ii)     (I)     is transparent and nonexclusive . . . .

16 U.S.C. § 6591b(b)(1).  Additionally,

(1)     Project size
A project under this section may not exceed 3000 acres.

(2)     Location
A project under this section shall be limited to areas--
(A)     in the wildland-urban interface . . .

(3)     Roads
(A)     Permanent roads
     (i)     Prohibition on establishment
     A project under this section shall not include the establishment of permanent roads. . . .

(B) Temporary roads
The Secretary shall decommission any temporary road constructed under a project under this section not later than 3 years after the date on which the project is completed.

*Id.* § 6591b(c).  Further, "projects and activities carried out under this section shall be consistent with the land and resource management plan established under section 1604 of this title for the unit of the National Forest System containing the projects and activities."  *Id.* § 6591b(e).

As to plaintiffs' first contention, for the reasons provided above, the Lostine Project is not inconsistent with the Forest or River Plans, and so does not violate the HFRA on those grounds.

**B.      Collaborative Process**

Plaintiffs argue that the Lostine Project was not developed through a transparent and nonexclusive collaborative process.  They do not challenge whether the Project meets the other statutory requirements except as to the Forest Plan and River Plan.

The Administrative Record documents the criteria governing the collaborative process used to develop the Project, and outlines the collaborative process used.  AR 11278-86.

The collaborative process criteria include that the process was nonexclusive and included multiple interested parties representing diverse interests.  Here, a myriad of interested parties, including the Oregon Department of Forestry, Natural Resource Conservation Service, US Fish and Wildlife, National Marine Fisheries Service, Wallowa County Soil and Water Conservation District, Wallowa County Natural Resource Advisory Committee ("NRAC"), Wallowa Resources, Nez Perce Tribe, landowners, timber industry representatives, and plaintiffs, participated in the process[4].  AR 11280 (Lostine Corridor Public Safety Project Collaboration).  Multiple parties were involved at each stage of Project development.  Initially, in November 2015, the Forest Service met with the above-listed parties to "discuss possible projects in

---

[4] NRAC, for instance, is an organization encompassing multiple interested persons representing diverse interests, including industry, environmental groups, government agencies, and private landowners, and was involved in Project development beginning at least in November 2015.  AR 10454 (Farm Bill Category Exclusion Check Sheet), 11279-80.

Wallowa County to address forest health issues," and agreed "that highest priority location for action was the Lostine Corridor." AR 11280.

The Forest Service contacted plaintiff GHCC by phone in January 2016, to discuss a possible project in the Lostine Corridor, including "potential concerns the organization . . . may have and design considerations to address these concerns." *Id.* In February 2016, defendants published public notice of the scoping period during which defendants would present the Project to the public, gather information, and identify issues from public input. The notice was sent to local newspapers and mailed to 38 interested or affected parties. Defendants posted a scoping letter and maps to the Project Website, issued a press release, and held a meeting for local landowners. AR 11281. In March 2016, the Forest Service again contacted plaintiff GHCC by phone regarding the Project, and GHCC requested an extension to submit scoping comments, which the Forest Service granted. *Id.* That month, the Forest Service again contacted GHCC by phone "to offer to host a field tour for them to learn more about and share ideas about the Lostine Project." AR 11281. The Forest Service hosted three field visits in May and June 2016, including one co-hosted by NRAC and "open to all interested people," with invitations disseminated through various means. AR 11282-83. The Forest Service held an open house along with NRAC in July 2016, for "community members who may not have had a chance to participate yet and could not attend Field Visits." AR 11283. The Forest Service hosted two more field visits in September and October 2016 (as well as various meetings), and plaintiff Oregon Wild attended the October visit. AR 11283-84. The Forest Service held another meeting with GHCC staff in March 2017. AR 11284.

In addition to this involvement by plaintiffs, defendants on multiple occasions gave plaintiffs the opportunity to participate in Project development and provide feedback. The Forest

Service reached out to both plaintiffs during the scoping process, in March 2016, to answer questions about the Project. AR 10238 (Contact Log entry re Doug Heiken of Oregon Wild), AR 10233-37 (Contact Log entry re Veronica Warnock of GHCC). The Forest Service discussed Project design and mitigation with GHCC, and GHCC was informed that defendants were considering using the statutory CE for the Project. *Id.* GHCC requested, and was given, a time extension for GHCC's comments to allow them to visit the Project area. *Id.* After GHCC member Warnock visited the Project area, she spoke with defendant, who extended an open invitation to discuss the Project in the field, although Warnock did not take up this offer. AR 10251. *Wilderness Soc. v. Bureau of Land Mgmt.*, 526 F. App'x 790, 793 (9th Cir. 2013) ("This is not a case . . . where a [party] entitled to consultation actively sought to consult with an agency and was not afforded the opportunity.")

Plaintiffs object that defendants did not adequately collaborate with them, but the substantial Record evidence of defendants' contact with plaintiff belies this. Instead of participating, plaintiffs often objected to how the Project was being developed, rather than providing meaningful, substantive input. For instance, plaintiffs repeatedly insisted during the Project development that "formal collaborative groups" were required in Project development, AR 10321 (GHCC letter of March 18, 2016), 10523 (GHCC letter of August 23, 2016), even though there is no legal authority for such a requirement. Also, after the June 2016 field trip, in which plaintiff GHCC's conservation director participated, GHCC continued to object to application of the Farm Bill CE due to their dissatisfaction with how defendants structured the collaborative process. AR 10464, 10643, 11282. After GHCC repeated this complaint in an August 2016 letter to the Regional Forester, AR 10522-24, Forest Service official met with GHCC in September 2016 to discuss the Lostine Project, and other projects, AR 10553.

Likewise, the Forest Service in March 2016 invited GHCC to a field tour of the proposed project area, but instead of attending, GHCC submitted comments objecting to Project development process and design elements. AR 10226, 10251, 10320-24, 11281.

Plaintiffs raise multiple objections to the timeline that defendants followed in developing and collaborating on Project development, but none establishes a lack of transparent or inclusive collaboration. That Ranger Stein intended to form a team of experts starting at least of January 7, 2016, SAR 1167-69, or may have anticipated that the Project could be "controversial," as plaintiffs argue, Pl. Mot. Summ. J., at 40-41 (Docket No. 27), does not imply that there was no intention for Project design to be uncollaborative. Plaintiffs argue that the February 2, 2016 scoping letter did not mention consideration of the Farm Bill CE for Project design, but consideration of the CE was discussed with plaintiffs in March 2016. AR 10238, AR 10233-37. Plaintiffs argue that because there was a document referred to as "the most recent detailed proposed action" in May 2016, SAR 374, 1211, and because the Decision Memo has an attached document titled "Detailed Proposed Action" in April 2017, that the Project was almost finally designed a year before the Ranger issued her final decision, and so there was no opportunity for collaboration. This is speculative; it does not show that defendants obscured development of the Project from interested parties. Plaintiffs concede that the June 23, 2016, field trip was a collaborative event, but complain that certain individuals from plaintiffs' organization could not attend, and argue that certain Project details were shared with the public only then. This field trip was almost a year before the Decision Memo was signed, and plaintiffs have cited no authority or shown that this was an inadequate time frame for the public to participate in Project design. Plaintiffs argue that Ranger Stein mentioned "collaborating" with certain entities, but "meeting" with environmental groups, in a July 2016 newspaper interview as a concession that

defendants did not "collaborate" with environmental groups, AR 10480-86. This amounts to a matter of linguistics and should not be construed as any legally operative concession. That defendants posted a draft report on resource impacts with a Detailed Proposed Action in February 2017 is evidence only that defendants created a working draft document from which defendants could solicit feedback. *E.g.*, AR 10949-56. It does not mean the Project was fully developed before feedback could be received.

That defendants meaningfully collaborated on Project design and development is evidenced by the fact that the Forest Service altered Project design to address feedback. For instance, it precluded mechanized equipment use in RCHAs associated with thinning and fuel treatments, and modified the removal of hazard trees in some RCHAs. SAR 291. The Project was modified to avoid areas with heavy concentrations of moonworts, or due to the presence of goshawk or Cooper's hawk. AR 10743-44. The final Project provided for fewer temporary roads than an early version of the proposed action. AR 11257-58, SAR 26-27.

Plaintiffs seek to impose a more demanding definition for, and requirements of, a collaborative process. Plaintiff's interpretation of what collaboration requires here is not legally supported or required. Defendants' interpretation of, and implementation of, collaboration was not arbitrary or capricious. Plaintiffs mischaracterize Forest Service documents that provide guidance on what constitutes a collaborative process. The 2014 Farm Bill Key Messages and Frequently Asked Questions, AR 9035-36, the "Collaboration Planning Template," SAR 1107-10, and the 2015 Farm Bill handout, only broadly establish that, e.g., "[t]he collaborative process should include multiple interested persons representing diverse interests in the development and implementation of a project; and use a process that is transparent and inclusive." AR 9036. Key principles "should" include "[i]dentify and involve relevant stakeholders" (including seeking

"early involvement"), "[d]esign a strategy to conduct an open, inclusive and transparent process," and "[p]lan for implementation and evaluation as part of the collaborative effort, *id.*[5] Contrary to plaintiffs' arguments, this does not require a structured nonexclusive working group from initial design stage nor the widespread dissemination of every piece of information on Project design and impacts at every stage of the development process.

Additionally, plaintiffs fail to cite Forest Service documents that expand upon the requirements of collaboration:

> Work with a formal collaborative group is not necessary to meet these requirements. . . .

> There is no "one size fits all" approach to collaboration.
>> Project-level collaborative processes do not need to mirror more complex collaborative processes that may be appropriate at the programmatic/planning-level.
>> Each project will have its own unique issues and participants so the process may vary from project to project. . . .

> Provide enough information that participants can provide informed, insightful feedback – but don't try to make everyone experts in Forest Service programs/processes and applicable law/regulation/policy.

AR 11285-86. This interpretation, which is reasonable though informal, is entitled to some deference. *See Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 832 (9th Cir. 2012). Defendants satisfied the collaboration requirement. *See also* AR 9959 ("The Responsible Official has the liberty to craft a collaborative process appropriate for the complexity and scale of his/her project . . . ." (Collaboration Requirements & Considerations for HFRA Projects));

---

[5] *See also* SAR 1107-10: "Identify and Involve Relevant Stakeholders Early in the Process," "Design a Strategy to Conduct Non-exclusive and Transparent Collaboration," and "Plan for Development and Implementation as Part of the Collaborative Effort."

It was not arbitrary or capricious for defendants to implement the Farm Bill CE's collaboration requirement in the manner they did. The Lostine Project does not violate the HFRA in this regard.

## RECOMMENDATION

For these reasons, the Court should DENY plaintiffs' Motion for Summary Judgment, and GRANT defendant and intervenor-defendant's Motion for Summary Judgment. The Decision Memo does not violate the National Environmental Policy Act, National Forest Management Act, or Healthy Forest Restoration Act, under the arbitrary or capricious standard pursuant to the Administrative Procedure Act. The Court should also STRIKE plaintiffs' extra-record evidence.

## SCHEDULING ORDER

The above Findings and Recommendations will be referred to a United States District Judge for review. Objections, if any, are due June 25, 2018. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendations will go under advisement on that date.

IT IS SO ORDERED.

DATED this 11th day of June, 2018.

/s/ Patricia Sullivan
PATRICIA SULLIVAN
United States Magistrate Judge