Caroline Lobdell, Ore. Bar #021236
Scott W. Horngren, Ore. Bar #880604
Shay S. Scott, Ore. Bar #934214
Western Resources Legal Center
9220 SW Barbur Blvd., Suite 327
Portland, OR 97219
Telephone: (503) 768-8500
Fax: (503) 222-3255
Email: clobdell@wrlegal.org
Email: shorngren@wrlegal.org
Email: sscott@wrlegal.org

Attorneys for Defendant-Intervenor

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **HELLS CANYON PRESERVATION COUNCIL**, an Oregon non-profit corporation, and **OREGON WILD**, an Oregon non-profit corporation, | Case No. 2:17-cv-00843-SU |
| Plaintiffs, | **DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| vs. | |
| **KRIS STEIN**, in her official capacity as District Ranger of the Eagle Cap Ranger District, Wallowa-Whitman National Forest, and **UNITED STATES FOREST SERVICE**, and agency of the United States Department of the Agriculture, | |
| Defendants, | |
| and | |
| **WALLOWA COUNTY**, | |
| Defendant-Intervenor. | |

---

**DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL**

# TABLE OF CONTENTS

I.      INTRODUCTION. ................................................................................................ 1

II.     LEGAL STANDARD. ....................................................................................... 2

III.    ARGUMENT. ..................................................................................................... 4

        A.      Plaintiffs Are Not Likely to Succeed on the Merits. ................................... 4

                1.      Plaintiffs are not likely to succeed on the merits under NEPA. .................... 6

                2.      Plaintiffs are not likely to succeed on the merits under NFMA. .................. 9

                        i.      Biological evaluations. ........................................................ 9

                        ii.     Species viability. ............................................................. 10

                        iii.    River plan. ....................................................................... 11

        B.      Plaintiffs Do Not Show a Likelihood of Irreparable Harm. ....................... 12

        C.      The Balance of Harms Favors Denying the Injunction and
                Allowing this Public Safety Project to Proceed. ....................................... 20

        D.      The Public Interest Resoundingly Favors Public Safety and
                Denying the Injunction. ............................................................................. 25

IV.     CONCLUSION. ................................................................................................. 29

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................11

*Alliance for the Wild Rockies v. U.S. Forest Service*,
  2016 WL 3349221 (D. Idaho 2016) ..........................................................27

*Alpine Lakes Protection Soc'y v. Schlapfer*,
  518 F.2d 1089 (9th Cir. 1975) ...........................................................24, 25

*Am. Motorcyclist Ass'n v. Watt*,
  714 F.2d 962 (9th Cir. 1983) ..................................................................25

*Amoco Prod. Co. v. Village of Gambell, AK*,
  480 U.S. 531 (1987) ....................................................................17, 18, 19

*Conservation Congress v. U.S. Forest Service*,
  2015 WL 3467025 (E.D. Cal. 2015) ..........................................................27

*Cottonwood Environmental Law Center v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ..................................................................18

*Dellums v. Smith*,
  577 F. Supp. 1456 (N.D. Cal. 1984), *reversed on other grounds*,
  790 F.2d 817 (9th Cir. 1986) .....................................................................3

*Earth Island Inst. v. U.S. Forest Serv.*,
  697 F.3d 1010 (9th Cir. 2012) ....................................................................4

*Feldman v. Arizona Secretary of State's Office*,
  843 F.3d 366 (9th Cir. 2016) .....................................................................2

*Forest Conservation Council v. Forest Service*,
  66 F.3d 1489 (9th Cir. 1995), *abrogated on other grounds by*
  *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) ................3, 20

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) ....................................................................13

*Holmes v. Helms*,
  705 F.2d 343 (9th Cir. 1983) ....................................................................26

*Jiminez v. Barber*,
  252 F.2d 550 (9th Cir. 1958) .....................................................................3

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008), *overruled on other grounds by*
*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ...................................................... *passim*

*League of Wilderness Defenders/Blue Mountain Biodiversity Project*
*v. Connaughton*,
752 F.3d 755 (9th. Cir. 2014) ...................................................................25, 27

*Lopez v. Heckler*,
713 F.2d 1432 (9th Cir. 1983) ............................................................2, 4

*Mazurek v. Armstrong*,
520 U.S. 968 (1997).............................................................................2, 20

*Mich. Coal. of Radioactive Material Users, Inc. v Griepentrog*,
945 F.2d 150 (6th Cir. 1991) ...........................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*,
463 U.S. 29 (1983).............................................................................5

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
No. 16-299, 2018 WL 491526 (U.S. Jan. 22, 2018) .........................................6, 7

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) (Williams, J., concurring in part and dissenting
in part)........................................................................................17, 18

*Native Ecosystems Council v. Krueger*,
40 F. Supp. 3d 1344 (D. Mont. 2014).....................................................26

*O'Shea v. Littleton*,
414 U.S. 488 (1974)..........................................................................16

*Oregon Natural Resources Council Fund v. Goodman*,
505 F.3d 884 (9th Cir. 2007) .............................................................8

*Pacific Rivers Council v. U.S. Forest Service*,
942 F. Supp. 2d 1014 (E.D. Cal. 2013)...................................................27

*Penthouse Int'l, Ltd. V. Barnes*,
792 F.2d 943 (9th Cir. 1986) ...........................................................3

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ...........................................................5

*Sierra Forest Legacy v. Rey*,
691 F. Supp. 2d 1204 (E.D. Cal. 2010)...................................................26, 27

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013)..................................................26

*Sierra Nevada Forest Protection Campaign v. U.S. Forest Serv.*,
   2005 WL 1366488 (E.D. Cal. May 26, 2005) ......................................27

*Sw. Voter Registration Educ. Project v. Shelley*,
   344 F.3d 914 (9th Cir. 2003) ................................................................4

*Wildwest Institute v. Bull*,
   472 F.3d 587 (9th Cir. 2006) ..............................................................25

*Winter v. Natural Resources Def. Council, Inc.*,
   555 U.S. 7 (2008)......................................................................2, 11, 18, 19

**Statutes**

5 U.S.C. § 706(2)(A)......................................................................................4

16 U.S.C. § 1271...........................................................................................10

16 U.S.C. § 1274(d)(1)..................................................................................10

16 U.S.C. § 1278...........................................................................................10

16 U.S.C. § 6511(3).......................................................................................21

16 U.S.C. § 6591a...........................................................................................6

16 U.S.C. § 6591a(a).....................................................................................22

16 U.S.C. § 6591a(b).....................................................................................22

16 U.S.C. § 6591b.......................................................................................6, 7

16 U.S.C. § 6591b(a)(1).............................................................................5, 6

16 U.S.C. § 6591b(c)..................................................................................6, 8

**Other Authorities**

36 C.F.R. § 220.6(b).......................................................................................6

36 C.F.R. § 220.6(c).......................................................................................7

40 C.F.R. § 1508.4..........................................................................................6

71 Fed. Reg. 29,886, 29,897 (May 24, 2006) .............................................27

11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE §
   2948.1 (2d ed. 1995) ........................................................................................16

Executive Order 12898 ............................................................................................1

# I.  **INTRODUCTION.**

Plaintiffs' Motion for Injunction Pending Appeal should be denied.  After losing on the merits on all claims, plaintiffs now submit 11 new declarations in a last-ditch effort to halt the Lostine Corridor Public Safety Project.  Plaintiffs mischaracterize the public safety and forest health aspects of the Project as only "commercial logging," which include resiliency thinning, small group openings, and 1.5 miles of temporary road construction.  Plaintiffs disregard the need for these treatments and repeat ad nauseam their preference for keeping the Lostine River Corridor "untouched," a myopic view that unreasonably places the entire community in jeopardy.  Despite the risk of catastrophic wildfire and declining forest health, plaintiffs would expose this already-vulnerable corridor and the residents of Wallowa County to even greater risk by opposing this narrowly tailored treatment on limited areas of unhealthy forest.

Although plaintiffs concede that threats posed by "danger trees" can be addressed now, they ignore that the project as a whole is carefully designed to improve forest health, reduce the risk of wildfire, and provide greater opportunity for emergency responders to help in the event of fire.  The Lostine Corridor and Project area were specifically designated by governor Kitzhaber in 2014 as a vulnerable landscape in urgent need of treatment to address insect and disease-related threats.[1]  This public safety Project is critical to decreasing heavy fuel loads and

---

[1]  Safety is the dominant factor for the Project.  Declaration of Nils Christoffersen (Christoffersen Decl.) ¶¶ 6-7 (explaining that forest restoration needs in the Project area are critical, and that the Project "protects older, fire-resistant trees and selectively removes younger, fire-intolerant trees designed to be a selective harvest operation aimed at producing numerous benefits to forest health and public safety, and minimizing impacts to scenery and wildlife habitat.")  However, of not insignificant note, the Project also includes an environmental justice aspect that plaintiffs have entirely ignored.

Executive Order 12898 – Environmental Justice – Implementation of this project is anticipated to benefit human health or environmental effect to minority or low-

mitigating the risk of yet another catastrophic wildfire in this rural community. Plaintiffs have already lost on the merits in the district court and do not meet the standard for an injunction pending appeal under these facts. Stacking the court file with multiple extra-record declarations addressing only alleged irreparable harm does not change this prevailing fact. Here, the balance of harms and public interest resoundingly favor denying the injunction and allowing this public safety project to proceed without delay.

## II.     LEGAL STANDARD.

The standard for issuing an injunction pending appeal is the same as the standard for analyzing whether to grant a preliminary injunction. *Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016); *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983). A plaintiff seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of equities tips in favor of the injunction; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 20-22 (2008).

A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A court should not enjoin action "except in a case clearly warranting it." *Dymo Indus., Inc. v. TapePrinter*, Inc., 326 F.2d 141, 143 (9th Cir. 1964). Nor can a court enjoin

---

income populations in Wallowa County. Rural communities in eastern Oregon, such as Wallowa County, are underserved populations. The Lostine Project, while small, can contribute important inputs into the local economy, including forest products, low-cost fuelwood, and opportunities for contract work for forest products and restoration businesses.

AR 11254.

conduct that has not been found to violate any law. *See, e.g.*, *Penthouse Int'l, Ltd. V. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986).

Motions for injunction pending appeal are to be granted sparingly. *See Dellums v. Smith*, 577 F. Supp. 1456, 1457 (N.D. Cal. 1984), *reversed on other grounds*, 790 F.2d 817 (9th Cir. 1986) (such requests are to be granted sparingly; they "interrupt the ordinary process of judicial review and postpone relief for the prevailing party"). Because a district court has fully considered the merits of the underlying action, a movant seeking an injunction pending appeal will have a "greater difficulty in demonstrating a likely success on the merits." *Mich. Coal. of Radioactive Material Users, Inc. v Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). A party must "demonstrate to a reviewing court that there is a likelihood of reversal."[2] *Id.* The court must also balance the competing claims of injury and consider the effect on the public interest of either granting or denying an injunction, even in the context of environmental litigation. *Forest Conservation Council v. Forest Service*, 66 F.3d 1489, 1496 (9th Cir. 1995), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). An injunction pending appeal should be denied if it would grant plaintiff relief it was not able to attain through disposition of the case and would effectively reverse the substance of the decision. *Jiminez v. Barber*, 252 F.2d 550, 553 (9th Cir. 1958) (injunction pending appeal denied when "the effect will be to give appellants the fruit of victory whether or not the appeal has merit").

---

[2] As noted in *Griepentrog*, the factors to be considered for both a preliminary injunction and stay pending appeal under Fed. R. App. P. 8 (Stay or Injunction Pending Appeal) are the same. However, balancing the factors is not identical due to the different procedural posture a case is in after the merits have already been decided. When considering a preliminary injunction at the initial stage of a case, the court is often required to make a decision based upon incomplete factual findings. However, here, the merits have already been decided. Thus, the movant's burden seeking a stay pending appeal is the same as seeking an injunction pending appeal after the merits have been decided. Plaintiffs must demonstrate a likelihood of reversal.

III.    **ARGUMENT.**

A.    **Plaintiffs Are Not Likely to Succeed on the Merits.**

Plaintiffs are not entitled to an injunction pending appeal because they cannot establish a likelihood of irreparable harm, a likelihood of success on their claims under the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347 (NEPA) or the National Forest Management Act, 16 U.S.C. §§ 1600-1687 (NFMA), and because the equities and public interest weigh decidedly against an injunction.  Pls.' Mot. Inj. Pending Appeal (Pls.' Mot.) (Dkt. #75) at 13-25.

In the context of a motion for an injunction pending appeal, as noted above, evaluating the probability of success on the merits necessarily evaluates the movant's *likelihood of obtaining a reversal on appeal*.  *Lopez*, 713 F.2d at 1436 (emphasis added).  Here, reversal of the district court's summary judgment ruling is unlikely because the court neither abused its discretion nor based its decision on an erroneous application of the law.  *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (explaining limited and deferential review afforded district court's preliminary injunction decision).

Establishing a likelihood of success on the merits in these circumstances is even more unlikely because judicial review for alleged violations of NFMA and NEPA is under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).  *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008).  A court will set aside agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This is a "narrow" standard, and the court will not substitute its judgment for that of the agency.  *McNair*, 537 F.3d 987.

Review is deferential, and the agency's action carries a "presumption of regularity." *San Luis &*
*Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

Under this narrow standard of review, a court may not substitute its judgment for that of
the agency. *Id*. Rather, an agency may only be reversed as arbitrary and capricious "if the
agency relied on factors Congress did not intent it to consider, entirely failed to consider an
important aspect of the problem, or offered an explanation that runs counter to the evidence
before the agency or is so implausible that it could not be ascribed to a difference in view or
product of agency expertise." *McNair*, 537 F.3d at 987 (citations and internal quotations
omitted); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co*., 463 U.S. 29, 43
(1983). In *McNair*, the unanimous en banc panel held that in an injunction context, "the Forest
Service acts arbitrarily and capriciously only when the record clearly demonstrates" a "clear
error in judgment in concluding a project meets requirements" of NFMA and the relevant Forest
Plan. *McNair*, 537 F.3d at 994.

The Ninth Circuit has also recognized a sliding scale approach which allows a plaintiff to
obtain an injunction where there are "serious questions going to the merits and a balance of
hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there
is a likelihood of irreparable injury and that the injunction is in the public interest."
*Developmental Serv. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011). Plaintiffs cite this
alternative approach in their Legal Standard section, *see* Pls.' Mot. at 3, but then expand it
contrary to caselaw in their Irreparable Harm section. *Id*. at 4. Plaintiffs state that impact to
their members' aesthetic interests in visiting the Project area in its "undisturbed state" constitutes
irreparable harm, citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).
However, *All. for the Wild Rockies* addresses the government's claim limited to *economic loss*

resulting from deterioration of salvage trees, not a Project like Lostine, which is critical for public safety to minimize risk of wildfire and address forest health epidemics. *All. for the Wild Rockies v. Cottrell*, 632 F.3d at 1129. Citing *Cottonwood Envtl. Law Ctr. v. Forest Service*, 789 F.3d 1075, 1091 (9th Cir. 2015), plaintiffs then assert that establishing a likelihood of irreparable harm "should not be an onerous task for plaintiffs." Pls.' Mot. at 4. Yet, plaintiffs *completely misstate* this language from *Cottonwood*. The statement in *Cottonwood* suggesting that showing a likelihood or irreparable harm "should not be an onerous task" is made solely in the context of the congressional policy under the ESA "in conserving endangered and threatened species." 789 F.3d at 1091 (citing 16 U.S.C. § 1531). Here, plaintiffs have no ESA claim, and they are mischaracterizing *Cottonwood* in an effort to have the court require something less than a "likelihood of irreparable harm," which is indisputably required after *Winter*.

Here, an injunction would effectively postpone implementation of the Lostine Public Safety Project, which neither the law nor the equities support. Injunctive relief should not be issued, regardless of whether the request is analyzed under the traditional *Winter* test or the Ninth Circuit's alternative sliding scale approach, because an injunction would prevent actions to protect trees from the spread of insects and disease and halt action needed to mitigate the risk of wildfire to the community of Lostine and the surrounding area. *Alpine Lakes Protection Society v. Schlapfer*, 518 F.2d 1089 (9th Cir. 1975).

### 1. Plaintiffs are not likely to succeed on the merits under NEPA.

Although the Lostine Project obviously meets the statutory criteria under the 2014 Farm Bill amendments, 16 U.S.C. § 6591b(a)(1), and is thus categorically excluded (CE) from further NEPA analysis, plaintiffs argue that additional analysis was required under NEPA's more general "extraordinary circumstances" review. Pls.' Mot. at 13-14. Plaintiffs are unlikely to

prevail on appeal on this argument because they are attempting to impose NEPA's more general requirements where a statute explicitly *exempts* those requirements.[3]

Although Forest Service regulations establish a process to determine whether extraordinary circumstances exist under 36 C.F.R. § 220.6(b), which would normally preclude use of a CE and minimally require an Environmental Assessment (EA) under 40 C.F.R. § 1508.4, here, Congress expressly created categorical exclusions *by statute* under the HFRA 2014 Farm Bill amendments. *See* 16 U.S.C. §§ 6591a, 6591b. Notwithstanding this separate statutory CE, plaintiffs argue that the Project is nonetheless subject to more general "extraordinary circumstances" review under NEPA. The district court properly rejected plaintiffs' interpretation of the 2014 Farm Bill amendments based on the statute's plain language and context. Dkt. 63 at 17-18. The HFRA statutory CE specifically provides that projects meeting certain criteria "may be—(1) considered an action categorically excluded from the requirements of" NEPA.[4] *See* 16 U.S.C. § 6591b(a)(1).

The plain language of Section 6591b does not require "extraordinary circumstances" review under NEPA. And any language in NEPA discussing "extraordinary circumstances" review refers to procedures applicable to NEPA rules, 40 C.F.R. § 1508.4, not procedures applicable to an entirely separate statutory provision such as the 2014 Farm Bill amendments.

---

[3] To avoid duplicating arguments already filed in the district court, defendant-intervenor incorporates herein by reference its previously filed summary judgment and related points and arguments. Specifically, defendant-intervenor incorporates the points, arguments, authority, and testimony in Dkt. Entry Nos. 9, 9-1, 10, 39, 55, 60, and 68 as if fully set forth herein.

[4] The criteria for applying the HFRA Statutory CE under the 2014 Farm Bill amendments are limited to those projects: (1) not exceeding 3,000 acres, (2) in the wildland-urban interface (WUI), and (3) not establishing permanent roads, and decommissioning any temporary roads within three years of project completion. 16 U.S.C. § 6591b(c). In considering the merits at the district court level, there was no factual dispute that the Lostine Project meets each of these requirements. *See* Dkt. No. 39 at 4.

The district court correctly recognized this flaw in plaintiffs' argument.  Dkt. 63 at 17-18 (district court will refrain from judicially creating such a requirement where none exists) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) (where Congress includes language in one statute but omits it in another, it is presumed Congress acted intentionally)); *see also Nat'l Ass'n of Mfrs. v. Dep't of Def.*, No. 16-299, 2018 WL 491526, at *12 (U.S. Jan. 22, 2018) (court must "give effect to Congress' express inclusions and exclusions, not disregard them").  The district court's conclusion that "extraordinary circumstances" review does not apply to actions categorically exempt under the 2014 Farm Bill amendments was correct, and plaintiffs are unlikely to succeed on this claim on appeal.  *Id.*; *see also* Dkts. 60, 70.

In support of a second NEPA argument, plaintiffs argue that "uncertainty" over the significance of impacts to special resources within the Project area raises a serious legal question as to whether the Forest Service violated 36 C.F.R. § 220.6(c).  Pls.' Mot. at 18-22.  This planning rule provides:

> **(c) Scoping.**  If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA.  If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect, prepare an EIS.

36 C.F.R. § 220.6(c).  Plaintiffs devote six pages of argument as to why an EA was required under this rule, yet, for the same reasons discussed above examining why the HFRA statutory CE purposely exempted the Project from NEPA's more general "extraordinary circumstances" review, *see* 16 U.S.C. § 6591b, the district court also concluded that the "Forest Service was not required to determine whether extraordinary circumstances required preparation of an EIS or EA."  Dkt. 63 at 18.  Plaintiffs provide the same reasoning for this argument – and again,

plaintiffs fail to give effect to the congressionally enacted CE under 16 U.S.C. § 6591b. Their

argument is not likely to be any more persuasive or prevail on appeal.

## 2.     <u>Plaintiffs are not likely to succeed on the merits under NFMA</u>.

Plaintiffs contend that the Forest Service failed to prepare biological evaluations for

sensitive wildlife and plants, *see* Pls.' Mot. at 22-23, failed to ensure species' viability for

sensitive wildlife or management indicator species (MIS), *id*. at 23-25, and failed to comply with

the Lostine River Plan. *Id.* at 25-26. Based on these arguments, plaintiffs assert that the decision

violates NFMA because it is inconsistent with the Wallowa Whitman National Forest (WWNF)

Land and Resource Management Plan (Forest Plan), as amended by the River Plan. Compl.

¶¶ 85-86. Plaintiffs are unlikely to prevail on these arguments.

### i.     <u>Biological evaluations</u>.

Although plaintiffs argue that the Forest Service was required to prepare a biological

evaluation for sensitive plants and wildlife in accordance with Forest Service Manual (FSM)

2670, *see* Pls.' Mot. at 23, they continue to rely on *Oregon Natural Resources Council Fund v.*

*Goodman*, 505 F.3d 884 (9th Cir. 2007), for their conclusion that the Forest Service's sensitive

species analysis is insufficient. However, the biological evaluation at issue in *Goodman* was

prepared in connection with an EIS pursuant to NEPA generally. *Goodman*, 505 F.3d at 887.

Here, the Lostine Public Safety Project meets all of the requirements for the HFRA statutory CE

under 16 U.S.C. § 6591b(c). Thus, the scope and extent of analysis required is limited by the

agency's reasonable determination that the HFRA statutory CE applies. *Goodman* is therefore

distinguishable. The district court correctly concluded that the Forest Service did not violate the

Forest Plan or NFMA in making that determination. Dkt. 63 at 23; Dkt. 70.

###### ii. **Species viability**.

Plaintiffs also maintain that they are likely to obtain reversal because the record lacks "both population data for sensitive wildlife and MIS" and "adequate analysis of the Project's impacts on those species' habitats" as required under NFMA. Dkt. 75 at 24. Yet, as correctly noted by the district court, the Wildlife and Botanical Reports do analyze species viability and find that any impacts to relevant species in the Project area are not likely to contribute to a trend toward federal listing under the Endangered Species Act or cause a loss of viability to these species. Dkt. 63 at 23-24; *see* AR 10941-47, 10949, 10952-56; *see also* AR 10809, 10830-52, 10919 (Aquatics Report analysis of each threatened or endangered species in the Project area and conclusion that the Project "May Impact Individuals or Habitat" ("MIIH") but would not likely contribute to a trend towards a federal listing or cause a loss of viability for sensitive species).

Furthermore, as the district court correctly held, agencies may rely on the reasonable scientific conclusions of their own experts, and the fact that an agency does not rely on data or information that a party challenging an agency's decision believes is more compelling does not render the agency's ultimate decision arbitrary and capricious.[5] Dkt. 63 at 24 (citing *McNair*,

---

[5] Plaintiffs' declarants also raise concerns that the Project may impact the moonwart, fairy slipper, wolverine, and other species. However, plaintiffs have not raised an Endangered Species Act claim. Species viability was analyzed by the Wildlife and Botanical reports. AR 10949-56 (Botanical Report); AR 10941-48 (Wildlife Report). These reports explain that any impact "will not likely contribute to a trend toward federal listing or cause a loss of viability to the population or species." AR 10947, 10953-57. The BE includes detailed analysis for each threatened or endangered species that may occur within the project area. AR 10830-10852. The Forest Service's analysis includes reviewing moonwort studies spanning more than a decade. AR 6218-25, 7362; *see also* SAR 1142 (showing species specific analysis for wolverine and other species); *McNair*, 537 F.3d at 997 ("habitat disturbance does not necessarily mean that a species' viability will be threatened"); AR 10809-919 (Aquatics Report completes Aquatics Biological Evaluation (BE) and a 2016 Salmonid Project Design Criteria Compliance Worksheet, and includes concurrence from the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS)).

537 F.3d at 997) ("To always require a particular type of proof that a project would maintain a species' population in a specific area would inhibit the Forest Service from conducting projects in the National Forests.").

Plaintiffs' argument that the Forest Service was required to use "species population data" or actual habitat assessments in analyzing what constitute "viable populations" of sensitive species legally fails. Dkt. No. 75 at 24. No such requirement exists that limits the types of data the Forest Service may rely on in making a species viability determination. The district court correctly decided that neither NFMA nor the Forest Plan require the Forest Service to "specify precisely how the Forest Service must demonstrate that its site-specific plans adequately provide for wildlife viability." *McNair*, 537 F.3d at 992.

### iii. <u>River plan</u>.

Finally, plaintiffs' NFMA claim under the Lostine Wild and Scenic River Management Plan fails because the Project is designed to protect and enhance the river's outstandingly remarkable values (ORVs). Dkt. No. 75 at 25-26. Under the Wild and Scenic Rivers Act (WRSA), the Forest Service must prepare a river plan to provide for the protection of the river values, and it must protect and enhance the free-flowing condition, water quality, and ORVs of designated rivers and river segments. 16 U.S.C. §§ 1271, 1274(d)(1), 1278.

Here, the River Plan requires, among other things, that "[w]ithin the Recreational section of the river, timber will be harvested to protect and enhance OR [outstanding remarkable] values, for public safety, and for emergency conditions such as insect infestations, disease control, fire and other natural catastrophe. This will be a non-scheduled timber harvest activity." AR 2173. Also, "[m]anagement direction for the river corridors will provide protection in the following ways: . . . Outstandingly remarkable values of the river must be protected and enhanced." AR

2179-80.  In addition, the Forest Service must "[u]tilize a full range of silvicultural techniques *for improving forest health* with an emphasis towards uneven-age management. . . .  Emphasis shall be on *long-term forest health rather than short-term*."  AR 2179 (emphases added).

The district court correctly concluded that none of plaintiffs' arguments regarding consistency of the Lostine Project with the River Plan demonstrate that the Forest Service's decision was arbitrary and capricious.  The River Plan requires the Forest Service to protect and enhance ORVs within the project area, and the occurrence of some harm to individual plants is not tantamount to an overall failure to protect or enhance ORVs or provide long term health benefits to the area.  Dkt. 63 at 26.  *See McNair*, 537 F.3d at 997-98.  The district court also properly deferred to the Forest Service's choice of mitigation measures for the Lostine Project and rejected plaintiffs' specific demands and criticisms for not requiring stand monitoring, buffering around sensitive species, or winter logging restrictions.  Dkt. 63 at 26.  The Forest Service has discretion to adopt reasonable mitigation measures that the agency believes will contribute towards plan objectives.  *See McNair*, 537 F.3d at 997.  Finally, the district court correctly determined in view of the record that the Project is an effort to reduce emergency conditions and will contribute to ORV protection and enhancement.  Dkt. 63 at 27.

## B.      Plaintiffs Do Not Show a Likelihood of Irreparable Harm.

Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, to obtain an injunction pending appeal.  *Winter*, 555 U.S. at 20-22; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Plaintiffs have submitted 11 new declarations ostensibly to address irreparable harm.  None of this newly-generated testimony is supportable science and falls far short of demonstrating the likelihood of actual and irreparable harm.  Although plaintiffs have the burden of establishing the likelihood of irreparable harm, on this

record, the facts are compelling that it is defendant-intervenor Wallowa County and the at-risk

community of Lostine who face the likelihood of irreparable harm by way of catastrophic fire,

inadequate emergency access and loss of wildlife and plants.[6]

As a preliminary matter, just six of the eleven declarations attempt to address harm

claimed by plaintiffs' members.[7] The remainder do not.[8] At the heart of plaintiffs' declarations

is the belief that the best way to protect the Lostine River Corridor is to leave unhealthy areas of

the forest untreated in their natural, diseased state, and that the silvicultural treatments of the

Lostine Project may increase fire risk and negatively impact plant and wildlife species.

Plaintiffs' climate ecologist David Mildrexler declares that resiliency thinning is *not*

*necessary* in forests with moist soil conditions, as these wetter forest areas can serve as fire

---

[6] The entire Project "is designed to reduce public risk from wildfire by reducing the amount and continuity of fuels at various scales across the project area and by facilitating emergency response in the event of a wildfire. The project will break up current forest fuels into discontinuous patches that will dampen future, unpredictable wildfire behavior and make those fires easier to manage." Declaration of Nils Christoffersen (Christoffersen Decl.) ¶ 5 ("100% of the project is designed to reduce public risk from wildfire.").

[7] Declaration of Maria Belknap in Support of Plaintiffs' Motion for Injunction Pending Appeal (Belknap Decl.) (Dkt. 78); Declaration of David Mildrexler in Support of Plaintiffs' Motion for Injunction Pending Appeal (Mildrexler Decl.) (Dkt. 79); Declaration of Brian Kelly in Support of Plaintiffs' Motion for Injunction Pending Appeal (Kelly Decl.) (Dkt. 80); Declaration of Deborah Richie in Support of Plaintiffs' Motion for Injunction Pending Appeal (Richie Decl.) (Dkt. 81); Declaration of Robert Klavins in Support of Plaintiffs' Motion for Injunction Pending Appeal (Klavins Decl.) (Dkt. 82); Declaration of Veronica Warnock in Support of Plaintiffs' Motion for Injunction Pending Appeal (Warnock Decl.) (Dkt. 83).

[8] Declaration of David Mangold in Support of Plaintiffs' Motion for Injunction Pending Appeal (Mangold Decl.) (Dkt. 76) (used drones for aerial photos of Project area); Declaration of Priscilla Coe in Support of Plaintiffs' Motion for Injunction Pending Appeal (Coe Decl.) (Dkt. 77) (transferred aerial photos on Project maps); Declaration of Darilyn Parry Brown in Support of Plaintiffs' Motion for Injunction Pending Appeal (Brown Decl.) (Dkt. 84) (GHCC can only pay nominal bond); Declaration of Sean Stevens in Support of Plaintiffs' Motion for Injunction Pending Appeal (Stevens Decl.) (Dkt. 85) (Oregon Wild can only pay nominal bond); and Declaration of Jennifer R. Schemm in Support of Plaintiffs' Motion for Injunction Pending Appeal (Schemm Decl.) (Dkt. 86) (authenticating extra record documents).

"refugia," or areas less frequently affected by fire. Declaration of David Mildrexler ¶¶ 6-8 (Dkt. 79). Plaintiffs' forester and plant specialist Brian Kelly also states that the planned resiliency thinning on 450 acres will have a significant "drying effect" on the vegetation and forest floor in the corridor, which supports sensitive vegetation due to its moist soil conditions. Declaration of Brian Kelly ¶¶ 4-7 (Dkt. 80). Both individuals state that the planned treatments "*may* actually make the forest more susceptible to fires in certain conditions." Kelly Decl. ¶ 5 (emphasis added); *see also* Mildrexler Decl. ¶ 10 ("Logging will contribute a large-pulse of fine-fuels. . . . More fine-fuels, coupled with increased solar radiation reaching the forest floor *can* increase the risk of fire.") (emphasis added).

But saying resiliency thinning or other important aspects of the project are not necessary, or that an area "may" or "can" serve as refugia does not establish that plaintiffs are likely to suffer irreparable harm. Plaintiffs' refugia argument is a speculative, unsupported generalized belief. *See* Pls.' Mot. at 1 ("Plaintiffs' members cherish the Canyon for a variety of reasons, including their *belief* that these cold and moist upland forests *may serve as a refugia* from uncharacteristically severe wildfire as our climate becomes warmer, drier, and windier.") (emphases added); *id*. at 6 ("this Canyon *may prove to be a fire refugia*") (emphasis added); *id*. at 29 ("plaintiffs' *members believe* [upland forests] *serve as fire refugia* in our changing climate") (emphasis added). This is not reliable science, nor does it establish the likelihood of irreparable harm. The concept of "refugia" is not mentioned in plaintiffs' Complaint, *see* Dkt. 1, nor is it mentioned in Plaintiffs' Motion for Summary Judgment. Dkt. 27. This "belief" is raised for the first time now. Plaintiffs' post-hoc belief is not science, but unsupported speculation, and should be rejected by the Court as a back-door attempt to raise new arguments on the merits under the guise of claimed harm. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1334 (9th Cir.

1992) ("Greenpeace may not establish a scientific controversy post hoc, through the affidavits of its own scientists and the experts it has hired, when at the time of the Service's action, there existed no substantial dispute that should have alerted the Service to the concerns that Greenpeace now raises.").

Plaintiffs' belief is inconsistent with other forester experts, who evaluate this issue with scientific reasoning. John (Buck) Fullerton and Nils Christoffersen directly refute plaintiffs' belief that drier, hotter, windier conditions somehow make this area more fire resistant.[9] Moreover, plaintiffs' experts focus only on short-term issues and ignore the long-term benefits that improve forest health and public safety. Declaration of John Fullerton ¶ 13 ("Removing fuels *will reduce the risk of wildfire*; it is the only piece of the fire triangle of oxygen, heat, and fuel that can be controlled." (emphasis added). "Suggesting that logging, and reducing fuels, increases fire danger is inaccurate. This canyon also runs north south, the heating potential is limited and only during certain periods of the day direct sunlight is on the forest floor." *Id*.

Similarly, forester Nils Christoffersen explains that contrary to plaintiffs' "refugia" concept, the Project "will help to moderate future fire behavior by removing ladder fuels and facilitating prescribed fire thereby reducing surface fuels.[10] The end result is less fuel, less

---

[9] Forester John Fullerton explains that "[t]he thinning will focus on addressing several forest health and public safety concerns. These treatments are designed to retain healthy dominant and co-dominant early seral conifer species and reduce the overly dense stands so that upon completion, the average stand density is lower, between 25 and 40 percent. This will reduce competition between tree species and improve the health and vigor of the stands." Fullerton Decl. ¶ 7. The treatments are "designed to increase forest health and resiliency of the trees and reduce unsafe fuel loads, which will help improve public safety and conservation of the corridor by reducing the risk of high severity insect, disease and wildfire." *Id*. ¶ 9.

[10] Nils Christoffersen is the Executive Director of Wallowa Resources based in Enterprise, Oregon. Wallowa Resources has become a national model for rural communities like Wallowa County. Wallowa Resources develops community-based solutions with a focus on land

continuity of fuel, and less severe fire effects." Christoffersen Decl. ¶ 10. Mr. Christoffersen

agrees with the Forest Service's purpose and need for the Project. "Removing small trees, and

reducing the number of stems per acre, will increase the water available to residual trees thus

making them less prone to mortality from fire, drought and insects. There is broad scientific

agreement that removing small trees, and reducing stand density, will moderate fire behavior and

give fire managers more flexibility both when re-introducing fire and when managing the

inevitable wildfire." *Id*.; *see also* Christoffersen Decl. ¶ 5 ("The project will break up current

forest fuels into discontinuous patches that will dampen future, unpredictable wildfire behavior

and make those fires easier to manage."); *see also* Fullerton Decl. ¶¶ 12-14 (disagreeing with

plaintiffs' "refugia" concept; "There is not a better site for a catastrophic wildfire."); AR 11243,

11249.

Thus, plaintiffs' "refugia" belief is counterintuitive, is disputed by science and the record,

and is contradicted by the very purpose and need for the project as determined by the Forest

Service. AR 2173-80. Plaintiffs' testimony that reducing accumulated fuels in the Project area

"may" actually increase fire danger is both factually unsupported and couched in terms of a

"possibility" instead of the "likely" standard necessary for establishing irreparable harm

warranting an injunction. Plaintiffs' testimony on this "refugia" notion is not competent

evidence of irreparable harm. Plaintiffs seeking injunctive relief are required to demonstrate that

irreparable injury is likely, not merely speculative. *O'Shea v. Littleton*, 414 U.S. 488, 502

---

stewardship, which help people sustain and improve their communities and their working lands
and honors Wallowa County's heritage of making a living from the land. Wallowa Resources
helps revitalize rural communities through stewardship work that unites and balances land and
resource management, the community, and the economy through husbandry, conservation and
care and carrying out sustainable forestry, ranching, and agricultural practices. Christoffersen
Decl. ¶¶ 1, 3-4.

(1974); *see also* 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 at 139 (2d ed. 1995).

The remainder of the declarations submitted by plaintiffs constitute broad, opinion-based testimony that criticizes the Forest Service's decision to proceed, explains how devastated they are for aesthetic reasons, laments how treatment areas may appear in the short term, and offers opposing views explaining their personal preference that the forest should be managed as "untouched."

Plaintiffs' Declaration of Deborah Richie (Dkt. 81) is from GHCC's board president. Ms. Richie would prefer "untrammeled wildness" in the Lostine corridor. As a naturalist, she states that knowing "that the force of change here will be *wildfires*, windstorms, and floods" is vital to her well-being, and she accepts the "dynamics of nature that shape this ecosystem" and is "outraged" that the Forest Service is calling the Project a public safety project. Richie Decl. ¶¶ 7-8, 16. Ms. Richie would "welcome" a "wildfire in the Lostine River watershed." *Id*. ¶ 28. Declarant Maria Belknap (Dkt. 78) is a hiker, and she is "dismayed" that the Forest Service is "seemingly more interested in getting timber volume of [sic] out the Canyon than being a good steward." Belknap Decl. ¶ 4, 9. Plaintiffs' Declaration of Veronica Warnock (Dkt. 83) is from GHCC's Conservation Director, who camps and hikes. She believes that trees dying from insects and disease should remain standing in their natural state, despite that insect-killed and diseased stands spread. Warnock Decl. ¶¶ 2, 10 ("They continue to provide unique habitats and affect wildfire behavior positively."). Finally, the Declaration of Robert Klavins (Dkt. 82) is from a member of both plaintiff organizations. He, too, would prefer a "light management approach" that remains relatively "untouched." Klavins Decl. ¶¶ 2, 5, 9.

None of this new testimony shows irreparable harm. The declarations were prepared and submitted after the merits in this case were already decided, well after plaintiffs became aware of the Project, and their common theme simply disagrees that the Project is needed to address public safety and forest health concerns at all – despite the long-term net benefits. Managing insect infested and diseased stands with dangerous fuel levels by leaving the areas "untouched" in their natural state is no management at all. Failing to manage danger and disease by "welcoming" wildfire as natural is itself a violation of the long-terms goals and objectives of the Forest Plan and River Plan. By proceeding with the Project, the Forest Service is meeting its plan obligations to manage for public safety, and for emergency conditions such as insect infestations, disease control, fire and other natural catastrophes. AR 2173, 2179-80; Fullerton Decl. ¶¶ 5-13; Christoffersen Decl. ¶¶ 5-10. Nor do any of plaintiffs' declarants effectively challenge the Forest Service's reasoning for why the Project is needed, or fairly and accurately address how the treatments are designed consistent with the Forest Service's detailed descriptions in the record and the long-term benefits they will provide. Plaintiffs simply disagree that major aspects of the Project should proceed, which is neither a legal justification for halting this important project nor competent evidence of irreparable harm.[11]

Moreover, any alleged irreparable harm (here, primarily plaintiffs' aesthetic enjoyment of the Lostine River Corridor as "untouched") must also relate to the underlying substantive policy that informs the statutory schemes. *See Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 544-45 (1987); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 337 (D.C. Cir. 1987) ("Harm

---

[11] "The treatments in the units are planned in a way that will reduce the risk of even greater epidemics of insect and disease, and lower the probability of intense, high severity crown fires." Fullerton Decl. ¶ 10. "Beetles overwinter beneath the bark of trees and removing beetle infested trees now will help prevent the spread of the insects before they emerge in the spring in search of other trees to infest." *Id*. ¶ 11.

for such purposes is of course defined in terms of the evil that the particular statute was designed to prevent.") (Williams, J., concurring in part and dissenting in part). Both the Supreme Court in *Gambell* and the D.C. Circuit in *Burford* considered the effect of statutory schemes, ultimately giving less weight to alleged injury that was not clearly the sort of injury a statutory scheme was designed to protect against. *Gambell*, 480 U.S. at 545; *Burford*, 835 F.2d at 337. Neither NFMA nor NEPA are aimed at protecting plaintiffs' purely aesthetic interests. Where values are considered, the irreparable harm inquiry must take those values identified by Congress into consideration, not plaintiffs' "preference" to see the forest remain "untouched." NFMA's multiple use mandate and duty to protect the public from the devastating effects of catastrophic fire, as well as the HFRA categorical exclusion, clearly indicate Congress's intention to counterbalance the purely hands-off policy favored by plaintiffs in favor of public safety concerns and long-term forest health.

Ironically, if an injunction pending appeal were issued and, to no one's surprise, the next fire season culminates in a wildfire erupting and sweeping through the Lostine River Corridor in its current state, plaintiffs' members will have achieved nothing and will not have the same forest to recreate and enjoy.[12] *Cf.* Christoffersen Decl. ¶ 7 (explaining multiple wildfires "over the

---

[12] None of plaintiffs' arguments of "irreparable harm" are likely to occur in the absence of an injunction pending appeal. The decision imposes an upward diameter on resiliency thinning trees to be thinned of 21 dbh. Thus, this Project does not call for logging old-growth trees unrelated to treatments necessary for safety and to address danger. Second, plaintiffs' members will not be irreparably harmed due to concerns about visiting the Project area in a natural post-Project state. The Project is necessary to restore safety so that the public can access the area unaffected by unreasonable risks of danger from fire hazards and from falling hazard trees. Nor are plaintiffs harmed irreparably due to alleged NEPA violations. Nothing in NEPA allows a court considering an injunction to put a "thumb on the scales." *Id. See also Cottonwood Environmental Law Center v. U.S. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir. 2015) (recognizing *Winter* and *Monsanto* as overruling the more lenient standard for an injunction in NEPA cases). A NEPA violation, without more, does not establish the requisite likelihood of

past three summers across Oregon have proven the efficacy of fuel reduction treatments."). In contrast, the community of Lostine, the residents of Wallowa County, area businesses, and the rest of the public who also visits and enjoys the forest will suffer immeasurably. Plaintiffs would have this court play fiddle while the Lostine corridor faces an unreasonable risk of burning. As explained by forester Nils Christoffersen, "[I]t is critical that those who value national forests work together to balance individual values about any particular place with the broader risks to ecological function and conditions. Otherwise there is risk in losing many old trees, wildlife habitat, and sensitive plants." Christoffersen Decl. ¶ 8.

     **C.**     <u>The Balance of Harms Favors Denying the Injunction and Allowing this Public Safety Project to Proceed.</u>

An injunction does not issue automatically in an environmental case. On the contrary, the Supreme Court has emphasized that unless a statute unequivocally constrains equitable discretion, courts have full discretion to grant or deny injunctive relief. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 544-45 (1987). The Court in *Amoco* held that the interests served by environmental laws do not trump all other interests in considering an injunction. *Id.* at 544-46. In *Amoco*, the Ninth Circuit had erroneously reversed the district court, reasoning that an injunction was the appropriate remedy "absent unusual circumstances." *Id*. at 541. On review, the Supreme Court held that such a presumption of irreparable injury was "contrary to traditional equitable principles" and had no basis under the law. *Id*. at 545. Because neither NEPA nor NFMA constrain the district court's equitable powers, the court has full discretion to deny plaintiffs' request for an injunction pending appeal. *Accord Winter*, 555 U.S. at 24 (preliminary injunction is extraordinary remedy never awarded as of right; courts "'must balance

---

irreparable harm. Moreover, here, the Forest Service complied with NEPA by meeting the statutory criteria for the HFRA statutory CE.

the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief'") (quoting *Amoco*, 480 U.S. at 542)); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

Thus, even if the court were to assume a violation of NEPA or NFMA, it must balance the competing claims of injury and consider the effect on the public interest of either granting or denying an injunction pending appeal. *Forest Conservation Council v. Forest Service*, 66 F.3d 1489, 1496 (9th Cir. 1995). Here, there are ample facts demonstrating that the balance of harms tips decidedly against an injunction pending appeal. An injunction, even of just what plaintiffs refer to as the "commercial" logging, would effectively postpone implementation of the Lostine Public Safety Project and unnecessarily expose the community and forest to further, indefinite delay in addressing the risk of wildfire and landscape scale insect and disease infestations, which neither the law nor the equities support.

First, the community of Lostine is uniquely vulnerable to catastrophic wildfire that would sweep through the corridor, destroying lives, property, homes, infrastructure, both public and private lands, and everything in its path. Plaintiffs are concerned about a modest amount of harvest – but Wallowa County's concerns involve the loss of an entire forest and harm to surrounding residents and the economy from an insect and disease epidemic and almost certain catastrophic wildfire. Second Nash Decl. ¶ 4 ("Due to the condition of the forest and the layout of the Lostine Corridor, prevention of catastrophic wildfire is paramount to avoiding loss of life, vast private property damage to homes and private resources, losses in tourism, and the destruction of natural habitat for wildlife and fisheries."); *id.* ¶ 6 ("Poor forest health as a result of limited management has contributed to high rates of insect infestation and disease. These conditions make the likelihood of wildfire in the corridor increasingly likely."). The forests in

this corridor have a long history of poor forest health from insect damage and disease.[13]

AR 2224-25.

Second, this project is necessary to address community safety risks identified by the county under its emergency management plan.  In 2006, Wallowa County adopted a Community Wildfire Protection Plan (CWPP) under HFRA, 16 U.S.C. § 6511(3), to "reduce the impact of wildfire on lives, property, and the landscape" by making a plan for the "wildland urban interface" (WUI) areas in Wallowa County."  AR 6816-6903.  The communities and WUI areas most at risk from fire were "identified and prioritized based on public input, local area knowledge of the committee, and an assessment of hazard."  AR 6819.  Under the CWPP, the forested areas within the Lostine WUI are identified as a priority area in need of thinning, removal of dead trees, and trees infected by insect and disease.  AR 6837, 6843-44.  The risk of wildfire is so great that as part of the CWPP, Wallowa County adopted wildland fire use objectives to help manage forest fires, a maintenance plan for fuels treatments to increase protection to homes in the event of wildfire, and an emergency management plan "to protect lives, private property and key values from wildfire."  AR 6852, 6857, 6864; Nash Decl. ¶¶ 2, 4-5 (Dkt. 10); Second Nash Decl. ¶ 2 ("high priority area" identified by Governor John Kitzhaber).

Third, even the State of Oregon recognizes the emergency situation facing the Lostine community, which will not be addressed if the project is postponed indefinitely.  On April 4, 2014, Governor John Kitzhaber wrote to the Secretary of Agriculture and designated four landscape-scale "focal areas" on National Forests in Oregon in need of treatment due to "[i]nsect

---

[13]  "If a fire were to occur under current conditions, the heat would be so great as to denude the vegetation from the canyon walls, thus making the project area much more vulnerable to rock and mud slides.  Such rock and mud slides impose more risk to the safety of residents and local tourists and would potentially force the road to close for a season, or even years."  Second Nash Decl. ¶ 8.

and disease" having reached epidemic levels. AR 9008. The Lostine river corridor was one of the "landscape-scale" areas that governor Kitzhaber asked be included for treatment through projects authorized under the 2014 Farm Bill Amendments, 16 U.S.C. § 6591a(b), and the Secretary of Agriculture accepted this request. AR 9008-09.

Fourth, Congress enacted the insect and disease infestation HFRA statutory CE to expedite the approval process for projects needed for public safety by reducing the risks posed by insect and disease infestation – *viz.*, the Lostine Project. *See* 16 U.S.C. §§ 6591a(a), 6591a(d)(1); AR 11243 (Decision Memo describing objectives of the Lostine Project). The Project is precisely the type of project Congress contemplated when it enacted the HFRA statutory CE provisions in 2014, and congressional policy strongly favors treating these diseased and dangerous landscapes as soon as possible. Second Nash Decl. ¶ 2 ("After Governor John Kitzhaber identified the Wallowa-Whitman National Forest as a high priority area in 2014, the Forest Service and other agencies identified the Lostine River Corridor as a top project given the area's current condition . . . .").

Fifth, as explained in the Second Declaration of Wallowa County Commissioner Todd Nash, Wallowa County is depending on the Lostine Corridor Public Safety Project not only as a matter of public safety, but to ensure the community has a future with healthy forests. The project is necessary "to provide economic benefits to the local economy and to conserve the natural resources of the Lostine Corridor for the use and enjoyment of residents and tourists alike." Second Nash Decl. ¶ 3.

Sixth, the Lostine river corridor would be extremely dangerous in the event of a fire. The Project area is located 6.5 miles south of the town of Lostine, along an 11-mile road corridor adjacent to the Lostine River that is the only route in or out of the area. AR 11243.

It is a long narrow canyon that flows predominantly from south to north, with the river running on the west side of the road. A large portion of the road is wide enough for only one vehicle to travel on and with only intermittent pull outs for oncoming traffic to pass. Tall mature trees are present on both sides of the road, with dense understory in most of these areas. At the peak of tourist season, this remote and primitive road is bustling with travelers and many residents and tourists camp alongside the river in the developed campgrounds, with camp trailers, and tents. Many tourists on family vacation choose these areas to bring their children to because these areas include developed campgrounds.

. . .

[T]he danger is compounded because there is only one way in and out of the corridor, along the narrow gravel Upper Lostine Road, and in many places only room for one vehicle. As a result, emergency trucks coming in could not pass cars fleeing the fire. In fact, I am aware of only one ranger station that a helicopter could land in the even of an emergency. Plans for effective evacuation in the event of a fire are bleak. Emergency responders would likely either not be able to physically enter the corridor without tremendous risk to their own lives.

Second Nash Decl. ¶¶ 5, 7; *see also id*. ¶ 4 ("The Lostine Corridor provides access to private homes, as well to recreational uses shared with the public such as hunting, fishing, and hiking.").

Seventh, plaintiffs misunderstand the economic benefit Wallowa County receives from the Lostine Public Safety Project. Wallowa County does not receive direct proceeds from this sale, as plaintiffs claim. Rather, proceeds are returned to the Forest Service for future forest management. "This project is a stewardship contract. As such, the County does not receive direct tax revenue from the project.[14] Any revenues benefit the Wallowa County in that the proceeds are returned to the Forest Service, who in turn, uses the revenue to benefit the forests

---

[14] In addition to forest health and safety benefits, the Project will also help the County's local economy. Only one wood processing facility currently operates in in Wallowa County, Integrated BioMass Resources LLC, which is a firewood processing plant that employs 24 people in Wallowa County. Second Nash Decl. ¶ 11. "These types of small businesses rely on projects like the Lostine Safety Project and the contemplated hazard trees for a continued flow of timber and in order to offer decent and stable paying jobs to Wallowa County citizens." *Id*.

lands within Wallowa County.  These types of benefits contribute the public safety and local tourist economy."  Second Nash Decl. ¶ 10.

Eighth, injunctive relief should not issue where, as here, it would prevent actions to protect trees from the spread of insects and disease, *see Alpine Lakes Protection Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir. 1975), and protect the community from risk of wildfire. Fullerton Decl. ¶ 6 ("The overall forest health in this area, and particularly the Project area, has been in a steady decline, and it is plainly susceptible to high severity wildfire that would sweep through the corridor."); Christoffersen Decl. ¶ 6 ("This is not an industrial logging project but rather a selective harvest operation that will produce great benefits to forest health and public safety, while minimizing impacts to scenery and wildlife habitat."); *id*. ¶ 10 ("The end result is less fuel, less continuity of fuel, and less severe fire effects.").

Contrary to plaintiffs' characterization, the resiliency thinning and group selection harvests are designed to improve forest health, reduce the accumulation of fuels, and improve the vigor of the stands by reducing the risk of high severity insect infestation, disease and wildfire. Fullerton Decl. ¶¶ 7-10, 13 ("There is not a better site for a catastrophic wildfire with one outlet for safety that I can think of."); Second Nash Decl. ¶ 14 ("The County supports the Lostine Public Safety Project because the commercial harvest is relatively minimal and is narrowly designed to create defensive areas for emergency responders, such as fire fighters.").

**D.**     **The Public Interest Resoundingly Favors Public Safety and Denying the Injunction.**

The public interest recognizes the importance of removing diseased and suppressed trees and reducing fuel loads in order to benefit the long-term health of the forest, mitigate fire risk to the community, and protect human life and property.

Long-term forest health is a valid public interest that plaintiffs overlook in their fervor to preserve the Lostine Corridor as "untouched." *See Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965-67 (9th Cir. 1983); *Alpine Lakes Protection Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir. 1975) (denying injunction against forest health project). In *Alpine Lakes*, the court concluded that the public interest would not be served by granting an injunction, because the project was necessary to remove "diseased timber and prevent the insect infestation from spreading throughout . . . adjacent national forest lands." *Alpine Lakes*, 518 F.2d at 1090.

The resiliency thinning and planned treatments on the Lostine Public Safety Project are also designed to reduce insect and disease susceptibility and mortality in forested stands by reducing competition between trees. AR 11244; AR 11200 ("The stand metrics . . . show the stands in the corridor are characterized by declining vigor, increasing competition related mortality, and increasing vulnerability to insects and disease. Thinning of the stands will result in improved forest health."); *see also* Fullerton Decl. ¶ 5 ("I have personally walked this area and researched general field conditions which are significantly overstocked unhealthy and at a significantly higher fire risk."); Second Nash Decl. ¶ 6 ("[T]he overall forest health in this area declining. Many areas were severely overstocked with bug susceptible evergreen species. . . . These conditions make the likelihood of wildfire in the corridor increasingly likely."). The project will mitigate fire risk and the likelihood of severe fire behavior and damage. AR 11206 (noting effectiveness of thinning treatments to reduce incidence of most severe crown fires); *see also* AR 11229-30. Mitigating wildfires is a valid public interest. *League of Wilderness Defenders/Blue Mountain Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th. Cir. 2014); *see also Wildwest Institute v. Bull*, 472 F.3d 587, 592 (9th Cir. 2006) (weighing "the possibility of a severe wildfire in the area" when assessing the public interest for an injunction).

Avoiding wildfire is indisputably in the public interest when wildfires pose a threat to critical infrastructure, such as protecting municipal infrastructure and water supply. *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1350–51 (D. Mont. 2014) (strong public interest in protecting municipal water supplies from catastrophic wildfire). The Lostine River and River Road provide critical infrastructure, not just for residents as a means of access to private inholdings and for water rights, but for firefighters and for the public in accessing the Wallowa-Whitman National Forest and the Eagle Cap Wilderness. *See* AR 11207 ("Where thinnings are implemented adjacent to the Lostine access road, the resulting conditions should function as a shaded fuel break *reducing fire intensity along the road for same ingress and egress of firefighting personnel and the potential evacuation* of recreational users during a wildfire event.") (emphasis added). Plaintiffs here cannot show that any short-term preservation of the Lostine Corridor as "untouched" is more in the public's interest than ensuring that these critical infrastructure resources continue to be accessible to the public and emergency responders over the long term.

The Court must also consider the direct risks wildfire pose to human life, private property, and wildlife habitat. "Logging is not per se sufficient to warrant an injunction, despite the fact that certain trees will be permanently removed from the forest." *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014) (citing *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010)). It is in the public interest to protect the health, safety, and property of this community from the threat of wildfires. *See Holmes v. Helms*, 705 F.2d 343, 346 (9th Cir. 1983). Courts routinely consider the risk of wildfire to human life and property when assessing the public interest. *See Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1113–15 (E.D. Cal. 2013); *Sierra Forest Legacy v. Rey*, 691 F. Supp. 2d 1204, 1210–11

(E.D. Cal. 2010); *Alliance for the Wild Rockies v. U.S. Forest Service*, at *5, 1:15-CV-00193-EJL, 2016 WL 3349221 (D. Idaho 2016). Threats to wildlife and their habitat from wildfire must also be considered. *Rey*, 691 F. Supp. 2d at 1211; *Pacific Rivers Council v. U.S. Forest Service*, 942 F. Supp. 2d 1014, 1030-32 (E.D. Cal. 2013); *see, e.g.*, 71 Fed. Reg. 29,886, 29,897 (May 24, 2006) (U.S. Fish and Wildlife Service determined that catastrophic wildfire a far greater risk to spotted owl viability than any short-term effects of fuel management activities on habitat). *See also Sierra Nevada Forest Protection Campaign v. U.S. Forest Serv.*, at *2, 2005 WL 1366488 (E.D. Cal. May 26, 2005) (denying injunction because "public interest" encompasses managing for long-term forest health and fire resilience, with corresponding reduced risk to surrounding communities and plants and wildlife).

Even a short delay in implementing a project like this may interfere with the public's interest in preventing wildfires. *Conservation Congress v. U.S. Forest Service*, at *4, 2:14-CV-02228-GEB-AC, 2015 WL 3467025 (E.D. Cal. 2015); *Connaughton*, 752 F.3d at 766 (noting that as risk of wildfire increases, the public interest tips further in favor of prompt management (citing *Alpine Lakes Prot. Soc'y*, 518 F.2d at 1090)). Here, the Forest Service's determination that the majority of areas in the Lostine Corridor scheduled for treatment are at a threshold for vulnerability to insect and disease mortality, clearly demonstrates that the public interest favors moving forward with the thinning and other forest health and safety treatments now without delay. AR 11200. The paramount interests of promoting forest health, public safety, and protecting the community from catastrophic wildfire demand nothing less.

## IV. <u>CONCLUSION</u>.

For the reasons set forth above and in the supporting declarations of John Fullerton, Todd Nash, and Nils Christoffersen, Plaintiffs' Motion for Injunction Pending Appeal should be denied.

Respectfully submitted this 22nd day of October, 2018.

/s/ Caroline Lobdell
Caroline Lobdell, Ore. Bar #021236

Shay S. Scott, Ore. Bar # 934214
Scott W. Horngren, Ore. Bar #880604

Western Resources Legal Center
9220 SW Barbur Blvd., Suite 327
Portland, OR 97219
Telephone: (503) 768-8500
Fax: (503) 222-3255
Email: clobdell@wrlegal.org
Email: sscott@wrlegal.org
Email: shorngren@wrlegal.org

Attorneys for Defendant-Intervenor

## CERTIFICATE OF SERVICE

I, Caroline Lobdell, hereby certify that I, on October 22, 2018, I caused the foregoing

**DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFFS' MOTION FOR**

**INJUNCTION PENDING APPEAL** to be served upon counsel of record through the Court's

electronic service system.

Dated this 22nd day of October, 2018.


/s/ Caroline Lobdell
Caroline Lobdell