Jennifer R. Schemm, OSB #970086
Attorney at Law
602 O Avenue
La Grande, OR 97850
Tel: 541-910-4833
Fax: 541-962-7831
Email: jschemm@eoni.com

Jennifer R. Schwartz, OSB #072978
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
Email: jenniferroseschwartz@gmail.com

    Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL**, an Oregon nonprofit corporation, and **OREGON WILD**, an Oregon nonprofit corporation, | Case Number:  2:17-cv-00843-SU |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION TO DENY PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL (ECF NO. 98)** |
| **KRIS STEIN,** District Ranger, Eagle Cap Ranger District, Wallowa-Whitman National Forest, in her official capacity; and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture, | |
| Defendants, | |
| and | |
| **WALLOWA COUNTY**, a political subdivision of the State of Oregon, | |
| Defendant-Intervenor. | |

Pursuant to Federal Rule of Civil Procedure 72(b) and Local Rule 135-3(a), plaintiffs object to the Findings and Recommendations (F&R) of Magistrate Judge Sullivan (the magistrate) on plaintiffs' motion for injunction pending appeal (motion for injunction). When any party objects to any portion of a magistrate judge's findings and recommendations, the district court must make a de novo determination of that portion of the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Bus. Machines Inc*., 656 F.2d 1309, 1313 (9th Cir. 1981). The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* (quoting 28 U.S.C. § 636(b)).

Plaintiffs object to the magistrate's findings that plaintiffs: (1) failed to show at least serious questions on the merits of their claims under the National Environmental Policy Act (NEPA) and the National Forest Management Act (NFMA); and (2) failed to demonstrate the balance of hardships tips sharply in plaintiffs' favor.

## I.    Objections to Findings Plaintiffs Failed to Show at Least Serious Questions on the Merits of Their NEPA and NFMA Claims.

Plaintiffs object to the magistrate's findings that they failed to show serious legal questions on the merits of their NEPA and NFMA claims for the reasons set forth in their motion for injunction and supporting reply brief. *Motion for Injunction* (ECF No. 75) at 13-26, *Reply* (ECF No. 94) at 8-23. Certain aspects of the findings warrant further discussion here.

### A.    HFRA §603 Projects are Not "Exempt" from NEPA's Pre-Existing Process for the Proper Use of Categorical Exclusions.

The magistrate erroneously finds that Congress' choice to expressly employ NEPA based terms of art – "categorical exclusion" and "scoping" – which have *no plain meaning* outside of how the CEQ regulations and the Forest Service's own regulations have defined those terms for decades, "do *not* here import a "cluster of ideas"" that "impose extraordinary circumstances

review." F&R at 6 (emphasis added); *see Motion of Injunction* at 14-17, *Reply* at 8-15.  Not only is this finding at odds with Supreme Court precedent, but the magistrate, while acknowledging "scoping" is required, again made no attempt to define or otherwise explain what Congress then meant by inclusion of a "scoping" provision in §603(f) if it is not what the Forest Service itself has defined as the scoping process in 36 C.F.R. § 220.6(c).  *Motion of Injunction* at 14-17, *Reply* at 8-15 (citing *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012)).

The magistrate now states that it did not find HFRA §603 projects are "wholly exempt" from NEPA, but fails to explain what NEPA processes *do* still apply then.  F&R at 6, fn. 3.  The magistrate previously found that "extraordinary circumstances review does not apply to actions that are *categorically exempt* under the 2014 Farm Bill amendments." F&R on Summary Judgment Motions (ECF No. 63) at 18 (emphasis added).  Thus, it is unclear what other NEPA processes could apply if, as the magistrate recommends, the Forest Service is "categorically exempt" from adhering to either (1) the regulatory definition of  "categorical exclusion" that contains an express mandate that agencies account for "extraordinary circumstances," (40 C.F.R. § 1508.4) and (2) a scoping process that evaluates whether proposed actions may generate potentially significant environmental effects (i.e. extraordinary circumstances), such that the use of a CE is precluded.  36 C.F.R. § 220.6(c); 40 C.F.R. § 1508.4.  Indeed, *there is no other logical purpose of the scoping process* than to determine precisely that – the possibility of potentially significant impacts that warrant further environmental analysis before an action can be approved and implemented.  *See e.g. Hells Canyon Preservation Council ("HCPC II") v. Connaughton*, 2013 WL 665134, at *2 (D. Or. Feb. 22, 2013) (recognizing that even under a congressionally established categorical exclusion that the scoping process *is* the "process through which the agency determines whether the application of the CE is appropriate [.]")

B. <u>The Court Never Reached the Merits of Plaintiffs' NEPA Claim.</u>

Once finding the Forest Service was "exempt" from determining whether the Project may result in potentially significant impacts to the area's special resources, ECF No. 63, the magistrate never considered the merits of plaintiffs' argument that "extraordinary circumstances" exist here that require analysis in an Environmental Assessment (EA). Yet, in the F&R at issue here, the magistrate summarily asserts, apparently based on its prior findings under plaintiffs' NFMA arguments, that "even if extraordinary circumstances review applied" the record evidence here does not show "there exist those circumstances such that an [EA] was required." F&R at 7.

But the standards used for whether the Forest Service violated NFMA are different than those for determining under NEPA whether extraordinary circumstances exist. "A CE cannot be used in the presence of a listed resource condition [when] it is '*uncertain* whether the proposed action may have a significant effect on the environment.' 36 C.F.R. § 220.6(c)." *HCPC v. Connaughton ("HCPC I"),* Case No. 3:11-cv-00023-PK, slip copy at 38-39 (D. Or. Aug. 10, 2012); AR09047 (FSH 1909.15, Ch. 31.2). The magistrate is wrong that when applying the "appropriate degree of deference" to the agency, the record contains sufficient evaluations. F&R at 7. Courts may not defer to agency assertions that are unsupported by actual scientific evidence and analysis which is the case here. *W. Watersheds Proj. v. Kraayenbrink,* 632 F.3d 472, 493 (9th Cir. 2011). The magistrate also incorrectly states plaintiffs "argue against the validity of the agency's scientific evidence." F&R at 7. Rather, plaintiffs argue: (1) *there is no actual scientific evidence* to support the agency's conclusion that all the Project's potential effects to sensitive plants and rare closed-canopy dependent wildlife are certain to be insignificant; *and* (2) the record evidence that does exist runs counter to that conclusion. *Motion for Injunction* at 18-22, *Reply* at 15-20.

3 – PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION TO DENY PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

C. <u>The Magistrate Again Ignores Precedent Requiring the Agency to Show the Efficacy of its Mitigation Measures With Actual Analytical Data.</u>

The Magistrate "finds that the Record contains sufficient evaluations of…mitigation measures," F&R at 7, but fails to point to where in the record the agency showed, with actual analytical data, the efficacy of the one general botanical mitigation measure: "avoid" the few *known* sites of sensitive/rare plants.  Ground-disturbing activities with heavy machinery will occur throughout the 2,100-acre Project area, most of which is *unsurveyed* sensitive/rare plant habitat.  *Motion for Injunction* at 19-20; *Reply* at 16-22.  The record is silent on how the Forest Service will mitigate the deleterious impacts of heavy machinery use on the rare plants in these areas.  "[P]roposed mitigation measures must be 'developed to a reasonable degree' and supported by analytical data."  *HCPC I,* Case No. 3:11-cv-00023-PK, slip copy at 26-27 (citing *Nat'l Parks & Conservation Ass'n*, 241 F.3d 722, 734 (9th Cir. 2001)).  As in *Idaho Sporting Cong. v. Thomas*, "[w]ithout analytical data to support the proposed mitigation measures," this court should "not [be] persuaded that they amount to anything more than a 'mere listing' of good management practices."  137 F.3d 1146, 1151 (9th Cir. 1998).  *See also Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473-75 (9th Cir. 2000); *Neighbors of Cuddy Mtn. v. USFS*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("a 'perfunctory description' or 'mere listing' of mitigating measures is inadequate to satisfy NEPA's requirements.'").  Defendants' mitigation measure is not even sufficient under the Forest Service's own template for assessing extraordinary circumstances, which instructs resource specialists to adequately describe mitigation measures and to provide a "quantitative or qualitative explanation" of anticipated effectiveness "based on past experience and/or monitoring." SAR1112.

Similarly, nowhere in the record, does the Forest Service show how adverse impacts to closed-canopy dependent wildlife, such as marten, fisher and goshawk, will be mitigated by

4 – PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION TO DENY PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

logging prescriptions that call for dramatically reducing the percentage of canopy cover to such a degree that these forests will no longer be suitable habitat for these species. *Motion for Injunction* at 20-21; *Reply* at 20 (citing record evidence showing these species rely upon forests with 60% or greater canopy coverage and will avoid those with less than 50%).

D. The Record Does Not Demonstrate Consistency with Forest Plan Requirements for Sensitive Species or Wildlife Viability and Recovery as NFMA Requires.

The magistrate repeatedly refers to the Forest Service's draft wildlife and botanical reports as "extensive analyses" that demonstrate the agency met the Forest Plan's requirements for biological evaluations (BEs) and for ensuring species viability and recovery. Plaintiffs insert the wildlife report, AR10941-48, below and respectfully invite the Court to find where the Forest Service extensively analyzes the Project's intended effect of "opening up the canopy" on closed-canopy dependent wildlife such as marten, fisher and goshawk.

When perusing the report, it is important to keep in mind that BEs must contain species-specific effects analyses, explanations of the agency's "process and rationale" for reaching its effects determinations, and citations and references to scientific data and literature that corroborate those effects determinations. *Motion for Injunction* at 22-25; *Reply* at 20-21 (citing AR07734-36, 10416-17, 10427-39 (Forest Service Manual's BE requirements and process)). Moreover, as plaintiffs have repeatedly also explained, NFMA and governing case law requires that the Forest Service "monitor [management indicator species ("MIS")] population trends, and evaluate each project alternative in terms of the impact on both [MIS] habitat and [MIS] populations." *Lands Council v. Powell*, 395 F.3d 1019, 1036 (9th Cir. 2004) (citing *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 971-74 (9th Cir. 2002)). And to properly use a habitat assessment in lieu of actual population monitoring data (the "habitat-as-proxy" approach), the Forest Service must describe "the quantity and quality of habitat necessary to

5 – PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION TO DENY PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

sustain the viability of the species and use reliable and accurate methods to assess the existing

habitat." *Plfs' Motion for Summary Judgment* (ECF No. 27) at 32; *Motion for Injunction* at 23-

25; *Reply* at 20-21 (citing *Rittenhouse*, 305 F.3d at 972-73; *Lands Council v. McNair,* 537 F.3d

981, 997-98 (9th Cir. 2008); *Or. Nat. Resources Council v. Goodman*, 505 F.3d 884, 891 (9th

Cir. 2007); *Earth Island Instit. v. USFS*, 442 F.3d 1147, 1175-76 (9th Cir. 2006); *NEC v. USFS*,

428 F.3d 1233, 1249 (9th Cir. 2006)).

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

6 – PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION TO DENY
PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

# Lostine Corridor Public Safety Project
# WILDLIFE

## Introduction

Suitable habitat to support Region – 6 Sensitive wildlife species, neotropical migratory birds (NTMB), old growth/LOS associated species, snag and down wood associated species, and management indicator species (MIS) exists within the proposed project area. This project will have no effect on any threatened or endangered wildlife species and will not result in moving any sensitive species towards federal listing. The Lostine Corridor Safety Project will contribute to the viability of the species associated with habitat dominated by mixed conifer forest made up of ponderosa pine, Douglas-fir, western larch, lodgepole pine, Engelmann spruce and some sub-alpine fir.


This report has two primary purposes:

1. To disclose the effects of the proposed action to wildlife species that are federally listed threatened or endangered, on the Region 6 sensitive list, management indicator species for the Wallowa-Whitman National Forest, and wildlife species of interest.

2. To determine whether the proposed actions are consistent with Wallowa-Whitman National Forest Plan direction and the Lostine River Wild and Scenic River Management Plan.

## Proposed Action

The primary purpose and need of this project is to address the public safety issues in the corridor. Secondly, the project will address risks to the other values in the corridor including infrastructure (homes, cabins, recreation improvements, roads), the natural resource values. To reduce risks to these values the Forest Service is proposing the following within the project area boundary (approx. 2,110 acres):

- Removing hazard trees along travel routes and adjacent to residential, recreation, historic and improvements (addressing immediate hazards to people and infrastructure).

- Thinning stand densities to decrease severity of wildfire and to improve forest resiliency (addressing both risks to ingress and egress in the corridor in the event of wildfire, and risk of insect and disease impacts over the long term).

- Removing fuels (surface fuels, ladder fuels, and small woody debris) throughout the corridor, particularly in the wildland urban interface.

- Creating small (less than 2 acre) gaps/openings in lodge pole stands to break up continuous fuels so fire could be managed more effectively.

The project will also assess opportunities to provide wood products for local markets, including firewood, through implementation.

## Analysis Framework and Direction

### Wallowa-Whitman National Forest Plan (1990)

The Wallowa-Whitman National Forest Land and Resource Management Plan (Forest Plan) provides standards and guidelines to protect and enhance habitat for existing native and desired non-native vertebrate and invertebrate wildlife species. Applicable direction includes management guidelines for threatened, endangered, and sensitive species, snag management, dead and down material, raptor nest sites, and pileated woodpecker feeding areas. (Forest Plan 4-24, 4-44 — 4-46, 4-51-52, 4-71, 4-79).

### Lostine River Wild and Scenic River Management Plan (1993)

The Lostine River Wild and Scenic River Management Plan (River Plan) established the goals for 11 miles of the Lostine River designed as a 'recreational' river. For Wildlife this goal is to provide *"quality habitat that is maintained or increased for all wildlife species with no reduction in Proposed, Endangered, Threatened, and Sensitive (PETS) wildlife species habitat or populations"* (Lostine River Plan pg. 6).

## Existing Condition

### Federally Listed Threatened or Endangered Species

No federally listed threatened or endangered species, designated critical habitat, species proposed for listing or proposed critical habitat is known to be within or occupy the project area. Therefore, the determination is '**No Effect**'.

### Region 6 Sensitive Species

Table 1 displays Region 6 Forest Service sensitive wildlife species that either utilize habitats found within the project area, have been documented in the project area, or have been documented on the Wallowa Whitman National Forest.

Table 1, Region 6 Sensitive Species within known sightings, habitat, or known to be within the WWNF and their effects determination from the proposed action.

| Species | Preferred Habitat | Type Habitat Area Provides | Nest/Den Habitats | Prey/Forage Habitat | Occurrence | Effects or Impacts[1] |
|---|---|---|---|---|---|---|
| Regional 6 Sensitive Species | | | | | | |
| Lewis woodpecker *Melanerpes lewis* | Open woodland near water. Ponderosa pine and riparian cottonwood communities. | Open woodland near water. Ponderosa pine and riparian cottonwood communities. | Existing nest cavities excavated by other woodpeckers in large-diameter dead or dying trees. | Insects during spring and summer. Fruits, nuts, grains, and acorns during fall and winter. | Occurs in Wallowa County spring and summer during breeding season. Recorded sightings in analysis area. | MIIH |
| Pacific Fisher *Pekania pennanti* | Forested areas with streams, marshes and openings. | Forested area with streams and openings. | Tree cavity preferred but will also use hollow log or cavity in a rock out cropping. | Small mammals, carrion, birds, amphibians, and occasionally berries and vegetation. Prey | Suspected on WWNF and in the Lostine Corridor. | MIIH |

| Species | Preferred Habitat | Type Habitat Area Provides | Nest/Den Habitats | Prey/Forage Habitat | Occurrence | Effects or Impacts[1] |
|---|---|---|---|---|---|---|
| | | | | and habitat exist throughout analysis area. | | |
| North American wolverine *Gulo gulo luteus* | Open meadows, cliffs, talus slopes and subalpine forests. | Open meadows, old growth, and cliffs. | Boulder fields and talus slopes. | Small mammals, birds, and carrion. Prey and habitat exist throughout analysis area. | Documented on WWNF and in analysis area. | NI |
| Gray Wolf *Canis lupus* | Habitat Generalists | Available | Dens in hill sides, rock outcroppings, under large tree roots | Ungulates, rodents, rabbits, skunks, beaver, grouse, fish, porcupines, birds, coyotes, nuts, berries, and insects. | No known wolf pack territory. Between Imnaha and Minam wolf packs territories. Members of both packs visit area. | NI |
| Townsend's big-eared bat *Corynorhinus townsendii* | Variety of habitats most common is desert shrub, pinion-juniper and pine forest. | Pine Forest | Caves and abandoned mines | Insects | Documented on WWNF. No recorded sightings in analysis area. | NI |
| Spotted Bat *Euderma maculatum* | Desert, cliffs with crevices, low vegetation or openings in forests close to water | Openings in Forests close to water | Caves and abandoned mines | Insects and spiders | Documented on WWNF. No recorded sightings in analysis area. | NI |
| Fringed myotis *Myotis thysanodes* | Caves, abandoned mines, and diverse vegetative habitat | Diverse vegetative habitat | Caves and abandoned mines surrounded by vegetation | Insects and spiders | Documented on WWNF. No recorded sightings in analysis area. | NI |
| Columbia Spotted Frog (C) *Rana luteiventris* | Cold slow moving streams with oxbows, springs or marshes, ponds and small lakes | Cold slow moving streams with oxbows and springs, and ponds. | Surface water of Cold slow moving streams with oxbows, springs or marshes, ponds and small lakes. | Invertebrates: ants, beetles, mosquito larvae, grasshoppers, spiders, mollusks, tadpoles, and slugs. | Documented on WWNF. No recorded sightings in analysis area. | NI |
| Rocky Mountain Tailed Frog *Ascaphus montanus* | Cold rocky fast-flowing permanent mountain streams. | Cold rocky fast-flowing permanent mountain streams. | Eggs and larvae are attached to the underside rocks downstream. | Spiders, insects, snails, ticks, mites, and crickets. Tadpoles feed on diatoms, desmids, filamentous algae, and pollen. | Documented on WWNF. No recorded sightings in analysis area. | NI |

| Species | Preferred Habitat | Type Habitat Area Provides | Nest/Den Habitats | Prey/Forage Habitat | Occurrence | Effects or Impacts[1] |
|---|---|---|---|---|---|---|
| Northern bald eagle *Haliaetus leucocephalus* | Mature stands of trees near large bodies of water. | Mature stands of trees but not near large bodies of water only creeks. | Cliffs or large trees within a kilometer of water (lakes or rivers). | Fish, small mammals and birds, and carrion. | Documented on WWNF. No recorded sightings in analysis area. | NI |
| Harlequin Duck *Histrionicus histrionicus* | Fast flowing rivers and streams in mountains | Rivers and streams | On ground at base of shrub or tree, under fallen logs, close to edge of bank, small cliffs, tree cavities and stumps. | Aquatic insects and fish roe | Documented on WWNF. No recorded sightings in analysis area. | NI |
| White-headed woodpecker *Picoides albolarvatus* | Old growth, open large PIPO, mixed conifer by PIPO. | Old growth, open large PIPO, mixed conifer by PIPO. | In openings with snags, stumps, crown cover ≈ 12 %, leaning logs often < 3m from ground. | Seeds especially pine seeds, invertebrates, and sap. | Documented on the WWNF. No recorded sightings in analysis area. | NI |
| Pine grosbeak *Pinicola enucleator* | Open coniferous forests near treeline and montane meadows. | Open coniferous forests near treeline and montane meadows. | Dense foliage of trees 2-4 m above ground | Buds, newly grown needles, fly-catching, unripe seed and ovaries of forbs. | Documented on the WWNF. Sighting in 2005 in project area. | NI |
| Broad-tailed hummingbird *Selasphorus platycercus* | Mountain canyons with riparian vegetation and subalpine meadows. | Mountain canyons with riparian vegetation and subalpine meadows. | Tree branch behind overhanging branch. 1-5 feet above the ground. | Nectar and small insects. | Suspected on the WWNF. No recorded sightings in analysis area. | NI |
| Bumblebee, Butterflies and Land Snails | | | | | | |
| Western bumblebee *Bombus occidentalis* | Habitat generalist | Habitat throughout the project area | Colony with queen | Generalist forages on a variety of flowers | Documented on the WWNF. No recorded sightings in analysis area. | MIIH |
| Johnson's Hairstreak *Callophrys johnsoni* | Old growth and LOS conifer forests in dwarf mistletoe in the forest canopy at elevations > 2000 feet. | Old growth and LOS conifer forests in dwarf mistletoe in the forest canopy at elevations > 2000 feet. | Females lay eggs on the host plant (conifer mistletoe). | Larvae feed on exposed parts of conifer mistletoe. Adults feed on flower nectar that includes: Pacific dogwood, ceanothus, Pussy paws, and *Rubus spp*., and visit muddy areas for moisture. | Documented on WWNF. No recorded sightings in analysis area. | MIIH |

| Species | Preferred Habitat | Type Habitat Area Provides | Nest/Den Habitats | Prey/Forage Habitat | Occurrence | Effects or Impacts[1] |
|---|---|---|---|---|---|---|
| Intermountain skipper *Colias christina pseudochristina* | Open woodland, meadows, roadsides and open forests. | Steep sunny slopes between forest and shrubsteepe or grasslands | Eggs laid singly on leaves of peavine species | Peavine species as larvae and a variety of plants as adults. | Documented on the WWNF. No recorded sightings in analysis area. | MIIH |
| Silver-bordered fritillary *Boloria selene* | Wet meadows, bogs and marshes. Riparian areas. | Riparian areas. | Female lays eggs near host violet species. | Larval host plants: Northern bog violet and Pioneer violet. Adults' nectar from composite flowers; golden rod and black eyed Susan. | Documented on the WWNF. No recorded sightings in analysis area. | NI |
| Yuma skipper *Ochlodes yuma* | Beds of giant reeds near fresh water marshes, streams, ponds, seeps, sloughs, springs and canals. | Riparian areas, rivers and streams | Female lays eggs on or near reed species. | Reed species | Documented on the WWNF. No recorded sightings in analysis area. | NI |
| Fir Pinwheel *Radiodiscus abietum* | Moist, rocky forested terrain, at medium-high elevations with Douglas-fir trees as the dominant species with an understory that includes many forbs, deciduous shrubs, or talus sites on a low slope near permanent water. | Moist, rocky forested terrain, at medium-high elevations with Douglas-fir trees as the dominant species. | Moist, rocky forested terrain, at medium-high elevations with Douglas-fir trees as the dominant species. | Douglas-fir trees as the dominant species with an understory that includes many forbs, and deciduous shrubs. | Documented on the WWNF. No recorded sightings in project area. | NI |
| Shiny tightcoil *Pristiloma wascoense* | Moist surfaces of wood, green and decaying vegetation and rocks. | Moist surfaces of wood, green and decaying vegetation and rocks. | Moist surfaces of wood, green and decaying vegetation and rocks. | Graze on bacteria, fungi, yeasts and other microscopic organisms | Suspected on the WWNF. No recorded sightings in analysis area. | NI |

MIIH = May Impact Individuals or Habitat, but will not likely contribute to a trend towards federal listing or cause a loss of viability to the populations or species. NI = No Impact

**Management Indicator Species**

There are four management indicator species (MIS) identified in the Forest Plan, American marten, northern goshawk, pileated woodpecker, Rocky Mountain elk, and one group of species, primary cavity excavators. These species serve as indicators of the effects of management activities by representing a broad range of other wildlife species. Management indicator species are indicators of the quality and distribution of the type of habitat, viable populations, and adequate habitat also provided for other species that share similar habitat requirements. Table 2 displays the management indicator species of the Wallowa-Whitman National Forest that are

found within the project area, have been documented in the project area, or have been documented on the Wallowa Whitman National Forest.

**Table 2. Management indicator species documented in the analysis area.**

| Species* | Preferred Habitat | Type Habitat Area Provides | Nest/Den Habitats | Prey/Forage Habitats | Occurrence |
|---|---|---|---|---|---|
| American marten *Martes americana* | Unharvested, late-successional (grand fir, subalpine fir, and Engelmann spruce) or forests near a water source(springs and streams) | Potential and source habitat in southern end portion of project area | Trees with platforms, brooms, or cavities; subnivean[1] areas; hollow logs or slash piles; underground; rocks. | Slash piles; subnivean[1] areas; mistletoe; brooms; downed wood | Documented sightings in analysis area. |
| Northern Goshawk *Accipitor gentillis* | Mature and old growth forests | Mature and old growth forests | Multilayered canopy old growth, near water source, and on a moderate slope | Small birds and mammals | Documented sightings in analysis area. |
| Pileated Woodpecker *Dryocopus pileatus* | Mature and old growth forests | Mature and old growth forests | Snags | Snags and insect infested trees and logs | Documented sightings in analysis area. |
| Rocky Mountain Elk *Cervus elaphus nelsoni* | Habitat generalists | Timber Stringers with mature stands mixed with young stands and meadows, grasslands, shrublands and rockylands. | High grass, down logs, structure near the ground to hide young | Shrubs, forbs, grasses, bark, leaves and lichens | Documented sightings in analysis area. |
| Primary cavity excavators[2] | Snags and logs $\geq$20 inches in a variety of species and habitats. | Open meadows to mature and old growth habitats with logs and snags. | Variety of snag species and sizes $\geq$ 12 inches in LOS and old growth. | Seeds, insects and insect infested wood. | Documented sightings in analysis area. |

## Species of Interest

Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*). The Lostine Bighorn Sheep herd inhabits the Lostine Corridor Public Safety project area. This herd is part of a meta-population in the Hells Canyon/Snake River area that includes 15 other herds. All these herds interact between each other (Hells Canyon Initiative 2007). In 2015 the number of individuals in the Lostine Bighorn Sheep herd was approximately 85 (Penninger, 2015).

## Environmental Consequences

## Effects

There will be short-term direct effects as a result of the project activities, mostly caused by the machinery. Indirect effects are expected to be beneficial due to the decrease of down woody material. This treatment will provide enhanced wildlife habitat for both prey and predators that utilize mature open stands.

AR 10946

Opening up the canopy and allowing increased light to the forest floor will increase understory shrubs, forbs and grasses providing nesting, roosting and prey habitat for NTMBs, Lewis' woodpeckers, bumblebees, butterflies, terrestrial snail species, MIS, and other wildlife species. Treating the project areas will reduce the amount of fuel slash deposited on the ground and when treated in conjunction with fuel treatment objectives, reduce the chances of soil sterilization in the event of catastrophic fire. This project will help ensure future large diameter overstory trees will occupy these sites and eventually large snags for improved wildlife habitat.

**Federally Listed Threatened or Endangered Species**

There will be no effects to any federally listed threatened or endangered species, designated critical habitat, species proposed for listing or proposed critical habitat, since non exist within the project area.

**Region 6 Sensitive Species**

There may be effects to individual or habitats for some R-6 sensitive wildlife species.  Table 1 indicates which species may be affected and which will not be affected by the proposed actions. Individuals may be crushed or trampled and some habitat will be altered.  None of the proposed actions will move any R-6 sensitive species toward federal listing.

**Management Indicator Species**

The actions proposed may affect individuals or habitat but will continue to maintain viable populations of these species within the Wallowa-Whitman National Forest.

Effects anticipated from the activities proposed will maintain a viable population of the existing species within the planning area.  Treatment units were designed to avoid an identified goshawk nest.

If other nests site are found during implementation activities would cease and resume after the fledgling period ends. Seasonal restrictions of harvest activities are required within ½ mile of the nest during the nesting season from March 1 through August 30 for goshawk. This restriction should be extended to not later than 30 days if monitoring indicate that fledglings are still present in the nest stand after the ending date for each species.

**Species of Interest**

Rocky Mountain Bighorn Sheep usually avoid forested stands so there would not be any impacts to Bighorn Sheep.

**Cumulative Effects**

The proposed action in combination with past projects will have no anticipated adverse cumulative effects.  This proposed project would not change the distribution or abundance of wildlife species.

AR 10947

**<u>Consistencies</u>**

Based on the information documented in this report, the proposed actions under the Lostine Project are found to be consistent with Forest Plan as amended by the Lostine Wild and Scenic River Plan.



As the Court can see, nowhere in this wildlife report does the Forest Service provide effects analyses on closed-canopy dependent wildlife such as the American marten, fisher, goshawk or even wolverine. There is no discussion, for example, regarding whether sufficient canopy cover will remain post-project such that suitable habitat in the Lostine River corridor will not be reduced or eliminated for these species.  Nowhere does the report explain that if the Project does reduce or eliminate suitable habitat for those species in the Lostine River corridor, why that habitat loss or alteration will not impair the viability of these species on the Forest. Nowhere does this report even cite to, let alone explain, how any available scientific literature supports the Forest Service's determinations that the Project will have no impact (NI) on wolverine and may impact individuals or habitat (MIIH) for marten, fisher and goshawk, but will not cause a loss of their viability or contribute to a trend toward their federal listing.

In fact, there is no clarity in this wildlife report supporting the agency's viability determinations for marten, fisher, goshawk, pileated woodpecker or wolverine.  Despite the magistrate's earlier pronouncement that neither population data nor a habitat as proxy analysis is necessary to demonstrate species viability here, ECF No. 63 at 24, it now finds that this wildlife report does include a "proper habitat-as-proxy analysis."  F&R at 7.  But a quick review of the report establishes that the Forest Service never describes the quantity and quality of habitat necessary to sustain viable populations of wolverine, marten, fisher, goshawk, or pileated woodpecker.  Nor does anywhere else in the record.  Respectfully, can the Court find where the agency necessarily explained its scientific methodology for discerning such information and why it is accurate?  In short, this cursory report does not even purport to answer any of these legally required questions.  There is simply no basis in fact for the Court to find this report constitutes a valid BE with legally adequate species viability determinations.

I.     **Objections to Finding Plaintiffs Failed to Demonstrate that the Balance of Hardships Tips Sharply in Their Favor.**

For the reasons given in their motion for injunction and supporting reply brief, plaintiffs object to the magistrate's conclusion that the parties' hardships are equal rather than tipped sharply in plaintiffs' favor. *Motion for Injunction* at 26-32; *Reply* at 23-29. Interestingly, the magistrate's findings actually support a different conclusion, one where plaintiffs' irreparable environmental harm sharply outweighs defendants' harm from postponing, for a year or two, commercial logging designed to reduce the risk of wildfire, and insect and disease epidemics.

The magistrate found the following:

1.     "Plaintiffs have shown that they would be likely irreparably harmed absent an injunction pending appeal." F&R at 7, 9. The logging "could harm their use of the Lostine Corridor for recreational, aesthetic, spiritual, economic, and ecological purposes." *Id.* at 8. "The felling of the trees could significantly alter the forest, which could be long-term." *Id.* "[E]ven under defendants' characterization of the logging, the loss of trees and alterations to the forest could harm plaintiffs' interests." *Id.* at 9 (later concluding "th[is] loss of trees and forest alteration *would* likely harm plaintiffs' interests").

2.     "[T]he risks to the Lostine Corridor of infestation or disease are not imminent." *Id.* at 9-10. "The forest has survived despite a purported downward trajectory for over 25 years, and an injunction's delay would only be approximately two years." *Id.* at 10 (noting "[t]his weakens the argument that the need for the Project is imminent").

3.     The logging is needed "to protect the forest and the public from *potentially* catastrophic wildfires . . . and to improve forest health." *Id.* at 10 (emphasis added). The Project is "intended to restore forest health and reduce the risk of insect infestation and wildfire along the Lostine River." *Id.* at 3, 11 (commercial logging is "designed to improve forest

16 – PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION TO DENY PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

health, reduce the accumulation of fuels, and improve forest stand health by reducing the risk of severe infestation, disease and wildfire"). The commercial contractor will "plant fire-resistant trees, prepare a permanent helispot for emergencies, place protective boulders, and perform fuelwood decking." *Id.* at 11.

4.    Intervenor "presents evidence of economic benefits to the county that even a delay in logging could impair." *Id.* at 11. The evidence referenced by the magistrate is from Wallowa County Commissioner Todd Nash's declaration, paragraphs 3 and 10, which state that "the County does *not* receive direct tax revenue from the project." *Nash Decl.* (ECF No. 90), ¶ 10 (emphasis added). "Any revenues benefit Wallowa County only in so far as the proceeds are returned to the Forest Service, which in turn uses the revenue to benefit forest lands within Wallowa County." *Id.*

Accepting these facts, *League of Wilderness Defenders (LOWD) v. Connaughton* requires a conclusion that plaintiffs' irreparable harm outweighs defendants' interests in reducing fire, insect and disease risks. 752 F.3d 755 (9th Cir. 2014). In *LOWD*, the plaintiffs' irreparable harm stemmed from the logging of thousands of mature trees. *Id.* at 764-65 (project "likely to irreparably harm" plaintiffs' members' interest in the area even though the forests are not old-growth and have been previously unlogged). In *LOWD*, defendants' and intervenors' harms were the inability to reduce the risk of forest fires and insect infestation through logging, and loss of jobs and government revenue. *Id.* at 765-66. The threats of catastrophic fire, and insect and disease epidemics were not imminent. *Id.* Further, the jobs and revenue were only temporarily delayed and would materialize should the project ultimately be approved. *Id.* at 767.

Given these above competing harms, which are all present in the case at hand, the *LOWD* court held: "[w]ithout evidence of an *imminent* threat, we cannot say that the inability to mitigate

such risks for a temporary period outweighs the public's interest in maintaining [] habitat and mature trees in the Forest." *Id.* at 766. "[T]he balance of equities tips in [plaintiffs'] favor." *Id.* at 767. The district court's conclusion that these harms were equal was reversed. *LOWD v. Connaughton,* 2013 WL 3776305 at *17 (D. Or. July 17, 2013), *rev'd in part, affirmed in part*, 752 F.3d at 766.

The Ninth Circuit in *LOWD* declined to discuss whether, given these hardships, the balance tipped *sharply* in plaintiffs' favor. This was because the court held that plaintiffs were likely to succeed on the merits of one claim, and thus the irreparable injury only needed to outweigh defendants' harm. 752 F.3d at 765 n.3. Importantly, the *LOWD* court did not indicate in any way that, had it been required to find the balance of harms tipped sharply in plaintiffs' favor, it would not.

Here, the hardships to plaintiffs are more compelling and the injuries to defendants less urgent than in *LOWD*, warranting a finding that the balance of equities tips *sharply* in plaintiffs' favor. The plaintiffs' irreparable harm in *LOWD* stemmed from logging general national forest land. *LOWD,* 2013 WL 3776305 at *1. Here, compounding that irreparable injury is the fact that the proposed logging will drastically alter a beloved, congressionally designated Wild & Scenic River corridor comprised of cool, moist, relatively untouched mature forests, one-third of which are old growth; eliminating important habitat for rare and sensitive plants and wildlife, and destroying a potential refuge from the effects of climate change. *Motion for Injunction* at 3-13, *Reply* at 2-8.

In contrast, defendants' harm from being unable to lower wildfire risks through commercial logging is lessened because all this while, defendants here are thinning the ladder fuels up to 12 inches dbh that contribute to fire severity. *Reply* at 25-26. It is the thinning of

18 – PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION TO DENY PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

these smaller trees that will reduce the likelihood of a "catastrophic" wildfire in the next few

years. *Id.* The economic interests are less here as well. Intervenor, Wallowa County, will "*not*

receive direct tax revenue from the project," *Nash Decl.* (ECF No. 90), ¶ 10, and defendants'

economic injury is entirely speculative. *Reply* at 27-28. In fact, the Ninth Circuit has already

found that irreparable harm from logging even small to medium sized dead trees *sharply*

outweighs speculative economic harms. *Alliance for the Wild Rockies v Cottrell*, 632 F.3d 1127,

1129, 1135, 1137 (2011).

In sum, the magistrate's findings of fact coupled with Ninth Circuit precedent establish

plaintiffs have shown the balance of equities tips sharply in their favor.

## II.    Conclusion

For the reasons here, and in plaintiffs' motion for injunction pending appeal and

supporting reply brief, the Court should enjoin the commercial component of the Lostine Project

pending appeal.

Respectfully submitted this 23rd day of December, 2018.

> *s/ Jennifer R. Schemm*
> Jennifer Schemm (OSB # 970086)
> Tel: (541) 910-4833
> Email: jschemm@eoni.com
>
> *s/ Jennifer R. Schwartz*
> Jennifer Schwartz (OSB # 072978)
> Tel: (503) 780-8281
> Email: jenniferroseschwartz@gmail.com
>
> *Attorneys for Plaintiffs*